Pete GOMEZ et al., Plaintiffs-Appellants,

v.

**FLORIDA STATE EMPLOYMENT SERVICE et al., Defendants-Appellees.**

No. 26719.

United States Court of Appeals
Fifth Circuit.

Oct. 9, 1969.

Raymond Creel and Naples Farm, Inc.; Horton & Schwartz, Miami, Fla., of counsel.

Before JOHN R. BROWN, Chief Judge, and GEWIN and GOLDBERG, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Remarkable as it may seem in this litigation prone world, this is the premier case brought under a statute thirty-six years old. This case raises for the first time [1] the question of whether under the Wagner-Peyser Act of 1933 [2] and the regulations [3] promulgated by the Secretary of Labor pursuant to that Act migratory farm workers who accept work through the employment system set up by the Act and regulations have rights and remedies for violations. The question is whether these workers have rights and remedies under which they can get relief in Federal Courts when they are deprived of the protection and benefit of the wages and working conditions promised by the Act and regulations by employers and state officials—state officials charged with the protection of the workers' interest. Here the District Court dismissed the complaint on grounds that it had no jurisdiction and that the complaint failed to state a claim for which relief could be granted. We reverse and remand.

The employment system involved here does not supply only agricultural workers but workers in all areas. It is an interstate system that operates through local, State-controlled offices that are subject to the regulations [4] of the Secretary of Labor and that receive applications for work and workers and make

Kent Spriggs, Oxford, Miss., Joseph Segor, Miami, Fla., T. Michael Foster, Gerald Cassidy, Fort Myers, Fla., for appellants.

Alan R. Schwartz, Miami, Fla., Robert M. Eisenberg, Charles P. Milford, Jr., Jacksonville, Fla., Patrick H. Mears, General Counsel, Tallahassee, Fla., James R. Parks, Miami, Fla., Sorokoty, Hagaman, Morrissey & Monaco, Ray A. Morrissey, Jr., Naples, Fla., for appellees

1. The only reported litigation involving regulations under the Wagner-Peyser Act were suits against the federal government for breach of construction contracts where the employer was required either by the contract or the regulations of the War Manpower Commission to obtain labor from the United States Employment Service. Ottinger v. United States, 1952, 106 F.Supp. 198, 123 Ct.Cl. 23; Sanders v. United States, 1945, 60 F. Supp. 483, 104 Ct.Cl. 1.

2. Act of June 6, 1933, c. 49, 48 Stat. 113, 29 U.S.C.A. §§ 49 et seq.

3. 20 C.F.R. § 602.9. See note 5, infra.

4. See note 11 and accompanying text.

a series of attempts in wider and wider areas to fill the applications.[5]

The system was established in 1933 when Congress passed the Wagner-Peyser Act, which established the United States Employment Service as a bureau of the Department of Labor. The Act's basic objective was to establish an interstate system for the recruiting and transfer of labor.[6] The Act, quite obviously, was also intended to offer some protection to those employees who shift about the country [7] to meet the needs of those employers who voluntarily use the re-

5. The regulations provide:

"No order for recruitment of domestic agricultural workers shall be placed into interstate clearance unless:

(a) The State agency has established, pursuant to recruitment efforts made in accordance with regulations, policies and procedures of the Bureau of Employment Security (United States Employment Service), that domestic agricultural workers are not available locally or within the State.

(b) The State agency has compiled and examined data on the estimated crop acreage, yield and other production factors in accordance with procedures established by the Bureau of Employment Security (United States Employment Service) to assure the validity of need and the minimum number of agricultural workers required.

(c) The State agency has ascertained that wages offered are not less than the wages prevailing in the area of employment among similarly employed domestic agricultural workers recruited within the State and not less than those prevailing in the area of employment among similarly employed domestic agricultural workers recruited outside the State.

\*    \*    \*    \*    \*    \*

(e) The State agency has ascertained that the employer has offered to provide or pay for transportation for domestic agricultural workers (1) at terms not less favorable to the workers than those prevailing among the domestic agricultural workers in the area of employment recruited from the area of supply; or (2) in the absence of such prevailing practice in the area of employment, at terms not less favorable to the workers than those which prevail among the domestic agricultural workers recruited by out-of-State employers who recruit domestic agricultural workers from the area of supply, as determined by the State Agency in the State requested to supply the workers.

(f) The State agency has ascertained that other terms and conditions of employment offered are not less favorable than those prevailing in the area of employment for domestic agricultural workers for similar work."
20 C.F.R. § 602.9.

At the time this case arose the regulations regarding housing provided:

"(d) The State agency has ascertained that housing and facilities:

(1) Are available;

(2) Are hygienic and adequate to the climatic conditions of the area of employment;

(3) Are reasonably calculated to accommodate the agricultural workers sought; and

(4) (i) Will not endanger the lives, health, or safety of workers. In making such determinations the State agency must ascertain that the housing and facilities conform to the standards prescribed by the President's Committee on Migratory Labor (copies of these standards are available at all offices of the U. S. Employment Service), and applicable State, county, and local housing and sanitary requirements.

(ii) If an employer can show that he is taking adequate steps to come into compliance with the standards prescribed by the President's Committee on Migratory Labor a waiver until a date not later than December 31, 1967, may be issued by the State agency. After December 31, 1967, such waivers may be issued by the regional office of the Bureau of Employment Security, if the employer demonstrates that extenuating circumstances require more time."
32 F.R. 7701 (May 21, 1967).

The current regulations provide:

"(d) The state has ascertained that housing and facilities which comply with the provisions of part 620 of this chapter are available."
20 C.F.R. § 602.9(d). See notes 19–24, *infra.*

6. See statement of duties of the United States Employment Service, 29 U.S.C.A. § 49b.

7. See Migrant Farm Labor-Wagner-Peyser Act, 41 Op.A.G. 406, 409 (July 2, 1959).

sources of the federal government to secure workers.[8]

These objectives were to be accomplished through that well-known device of "cooperative federalism", and grant-in-aid system.[9] Under the particular system established by the Act, the state agencies, which are substantially funded by federal money and are subject to the regulations of the Secretary of Labor,[10] process applications for workers and, after concentric local searches to fill the application, send the request through the interstate facilities of the United States Employment Service.[11] Because of its information about the supply of labor in all parts of the country, the Service then is able to forward the application—"Clearance Order"—to a state agency that can fill the request.

In 1951, reflecting the growing national concern about the deplorable condition of many migratory Americans, usually Negroes or Mexican-Americans, who harvest the food for the nation's tables, the Secretary of Labor first promulgated referral standards for farm workers. (16 F.R. 9142). The standards, as those that followed,[12] were obviously designed to protect those workers that were acquired when farmers voluntarily sought the benefits of this federal system.

But conditions of farm workers apparently remained much the same despite these and other efforts. Their plight was vividly described by the Secretary of Labor in his letter seeking the Attorney General's opinion on the Secretary's power to promulgate what became substantially the regulations in question here.[13] The opinion referring to the Secretary's letter used these strong words: The "housing provided for migrant farm workers 'has frequently been overcrowded, unsanitary, lacking beds and bedding, unheated, and a fire hazard. Some migrants have even been required to sleep in the open, completely exposed to the elements.' These conditions 'breed disease and thus endanger the health of the whole community.' "[14] The conditions were there summed up in the direct and equally pungent words of the report of a Presidential study commission:

"Beyond wanting migrants to be available when needed and to be gone when not needed, they are expected to work under conditions no longer typical or characteristic of the American standard of life. In a period of rapidly advancing job and employment standards, we expect them to work at

---

8. The structure reflects its genesis as legislation passed during the dark days of the economic depression of the 1930s and the early days of 1933 when Congress labored under a restricted conception of its power, a conception fostered by contemporary decisions such as A.L.A. Schechter Poultry Corp. v. United States, 1935, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570; and Adair v. United States, 1908, 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436, which limited Congressional attempts to take direct action to improve the conditions of the American worker. See C. Swisher, American Constitutional Development 935 (2d ed. 1954); Brown, Free Will in the Frontiers of Federalism, 58 Mich.L.Rev. 999, 1019 (1960).

9. See Brown, note 8, *supra* at 1016–19.

10. In order for States to participate in the federal funds they must establish a state agency that meets the requirements of the Act and regulations of the Secretary of Labor, 29 U.S.C.A. § 49c.

11. The attempt to fill the request is first made in the local labor market. If this attempt is unsuccessful, copies of the order are forwarded to surrounding public employment offices within the state. If these efforts also fail the request is sent to a regional office of the Federal Employment Service, and, finally, to Washington where the request is sent to other areas that have an excess supply of labor.

12. See note 5, *supra*.

13. See note 5, *supra*.

14. Attorney General's opinion, note 7, *supra* at 408.

employment which, for all practical purposes, has no job standards." [15] It is the "job standards" promulgated by the Secretary under which Plaintiffs ask for relief. The standards are relevant not because they are self executing and apply of their own force to employing farmers. Rather, they become operative only through voluntary use of this Government Employment Service.[16]

Plaintiffs, twenty-nine migratory farm workers, six of whom appeal, alleged that in the fall of 1967 Naples Farms, Inc., through Raymond Creel, the superintendent, sought to take advantage of the recruitment service provided by the Florida State Employment Service and the United States Employment Service. The requisite forms were filled out and the request for workers—"Clearance Order"—was eventually sent through the interstate facilities of the United States Employment Service to Texas. In Texas the Texas State Employment Service forwarded the request to Plaintiff Pete Gomez [17] in Edinburg, Texas.

Plaintiffs also allege that in response to the request they went to Florida to accept the jobs. When they arrived, however, they found that the wages were lower than those called for in the regulations and the housing was woefully inadequate and far below the requirements [18] that should have been met before the request or "Clearance Order" had been processed. The list of grievances is long: There was no electricity in most cabins.[19] None of the cabins had running water and there were no working toilets.[20] There were no facili-

15. *Id.* quoting report of the President's Commission, "Migratory Labor in American Agriculture" (1951). See also references to other sources. *Id.* n. 1.

16. The Congress has often left the farmer free from the general regulation applicable to other segments of our economy. See, e. g. Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 201, et seq., 213 and Walsh-Healey Act, 41 U.S.C.A. §§ 35 et seq., 43. Farmers who choose to acquire their necessary labor supply from other sources, and not use the resources of the federal government, are free to subject workers to any conditions the laissez-faire economy and local laws will allow.

17. Gomez is apparently a crew boss or crew chief who organizes groups of workers and delivers a specific number of workers to a particular employer upon demand.

18. The housing regulations that must now be complied (see note 5, *supra*) with before a request for workers is supposed to be sent though the interstate channels of the United States Employment Service are found at 20 C.F.R. 620.1–.17.

19. The regulations now provide:
"(a) All housing sites shall be provided with electric service.
(b) Each habitable room and all common use rooms, and areas such as: Laundry rooms, toilets, privies, hallways, stairways etc., shall contain adequate ceiling or wall-type light fixtures. At least one wall-type electrical convenience outlet shall be provided in each individual living room.
(c) Adequate lighting shall be provided for the yard area, and pathways to common use facilities.
(d) All wiring and lighting fixtures shall be installed and maintained in a safe condition."
20 C.F.R. § 620.10.

20. The regulations now provide:
"Excreta and liquid waste disposal.
(a) Facilities shall be provided and maintained for effective disposal of excreta and liquid waste. Raw or treated liquid waste shall not be discharged or allowed to accumulate on the ground surface.
(b) Where public sewer systems are available, all facilities for disposal of excreta and liquid wastes shall be connected thereto.
(c) Where public sewers are not available, a sub-surface septic tank-seepage system or other type of liquid waste treatment and disposal system, privies or portable toilets shall be provided. Any requirements of the State health authority shall be complied with."
20 C.F.R. § 620.6.

ties for garbage pick-up or disposal.[21] There was no access to drinking water.[22] There were no workable showers.[23] And none of the cabins had any heat at all.[24]

It is also alleged that in February 1968 Plaintiff Gomez sought to rectify the situation. Believing that his proper avenue of redress was the Lee County Board of Health, he got Everett Cooper, a sanitarian for the Lee County Board of Health, to come to the campsite. Far from seeking compliance by the employer with the state health regulations or the regulations of the Secretary of Labor, however, Cooper threatened Gomez with a $500.00 fine for each offense if the houses were not repaired.

21. The regulations now provide:
"(a) Durable, fly-tight, clean containers in good condition of a minimum capacity of 20 gallons, shall be provided adjacent to each housing unit for the storage of garbage and other refuse. Such containers shall be provided in a minimum ratio of 1 per 15 persons.
(b) Provisions shall be made for collection of refuse at least twice a week, or more often if necessary. The disposal of refuse, which includes garbage, shall be in accordance with State and local law."
20 C.F.R. § 620.14.

22. The regulations now provide:
"(a) An adequate and convenient supply of water that meets the standards of the State health authority shall be provided.
(b) A cold water tap shall be available within 100 feet of each individual living unit when water is not provided in the unit. Adequate drainage facilities shall be provided for overflow and spillage.
(c) Common drinking cups shall not be permitted."
20 C.F.R. § 620.5.

23. The regulations now provide:
"(a) Bathing and handwashing facilities, supplied with hot and cold water under pressure, shall be provided for the use of all occupants. These facilities shall be clean and sanitary and located within 200 feet of each living unit.
(b) There shall be a minimum of 1 showerhead per 15 persons. Showerheads shall be spaced at least 3 feet apart, with a minimum of 9 square feet of floor space per unit. Adequate, dry dressing space shall be provided in common use facilities. Shower floors shall be constructed of nonabsorbent, nonskid materials and sloped to properly constructed floor drains. Except in individual family units, separate shower facilities shall be provided each sex. When common use shower facilities for both sexes are in the same building they shall be separated by a solid nonabsorbent wall extending from the floor to ceiling, or roof, and shall be plainly designated "men" or "women" in English and in the native language of the persons expected to occupy the housing."
20 C.F.R. § 620.12.

24. The regulations now provide:
"(a) All living quarters and service rooms shall be provided with properly installed, operable heating equipment capable of maintaining a temperature of at least 68° F. if, during the period of normal occupancy the temperature in such quarters falls below 68°.
(b) Any stoves or other sources of heat utilizing combustible fuel shall be installed and vented in such a manner as to prevent fire hazards and a dangerous concentration of gases. No portable heaters other than those operated by electricity shall be provided. If a solid or liquid fuel stove is used in a room with wooden or other combustible flooring, there shall be a concrete slab, insulated metal sheet, or other fireproof material on the floor under each stove, extending at least 13 inches beyond the perimeter of the base of the stove.
(c) Any wall or ceiling within 18 inches of a solid or liquid fuel stove or a stovepipe shall be of fireproof material. A vented metal collar shall be installed around a stovepipe, or vent passing through a wall, ceiling, floor or roof.
(d) When a heating system has automatic controls, the controls shall be of the type which cut off the fuel supply upon the failure or interruption of the flame or ignition, or whenever a predetermined safe temperature or pressure is exceeded."
20 C.F.R. § 620.9.

Although the regulations cited in notes 19–24 were not in effect at the time this claim arose, we do not regard the current regulations as providing significantly different standards. They are merely more specific. See note 5, *supra*.

The basis of Plaintiffs' complaint against the employees of the state employment agency is that they failed to meet the obligations imposed on them by the regulations. (See note 5, *supra*). It is directly charged that they made no attempt to determine whether Naples Farms would comply with the regulations and by this failure deprived Plaintiffs of the benefit of these regulations. Naples Farms is alleged to have intentionally deprived Plaintiffs of the protection of the regulations by misleading the State officials. Likewise, Cooper, the sanitarian, is a defendant because of Plaintiffs' claim that he intentionally deprived them of the protection of the regulations. Finally, Plaintiffs allege that all Defendants not only acted intentionally but that they acted jointly and as a part of a conspiracy.

Since there is no diversity jurisdiction, the Plaintiffs, although their damages may be real, can obtain relief through the Federal Court only if damage was done to a federal right that the Federal Courts are empowered to protect. The existence of the federal right in this case turns on whether the Wagner-Peyser Act, 29 U.S.C.A. §§ 49 *et seq.*, and the regulations of the Secretary of Labor promulgated pursuant to the Act bestow rights that the workers may assert, and if so, whether the Wagner-Peyser Act and the regulations created a federal remedy. Additionally, the claim is made under the civil rights acts that the rights created by the regulations and Act, are "privileges, or immunities secured by the * * * laws" [25] of the United States.

We start with the proposition that there can be no doubt that the regulations of the Secretary of Labor were intended to protect the interest of the workers. The conditions were deplorable. (See note 14, *supra*, and accompanying text). There were no standards. The Secretary was concerned about preventing the use of the federal resources to help prolong these conditions and to sub-vert other efforts to improve the conditions of the workers. In words attributable to the Secretary of Labor, the regulations were said to be designed to prevent "the public employment service from being utilized to send workers over long distances to employment providing quarters dangerous to their health and safety." (Attorney General's opinion note 7, *supra* at 409). The Secretary's concern with workers, their wages, living and transportation conditions as being at the heart of the Secretary's purpose in promulgating more effective standards is attested by the Attorney General's paraphrase:

"Concerning the proposed wage amendment, it is said that its purpose, like that of the existing regulation, is to prevent the use of the interstate system as a vehicle for undermining prevailing wage rates in the area of employment. As to the transportation amendment, you advise me that like the wage proposal it seeks only equal treatment for employees referred through the interstate recruitment program".

Attorney General's opinion, note 7, *supra* at 409.

Just as important as this "legislative" history in demonstrating the Secretary's purpose is the clear emphasis of the regulations themselves. (See note 5, *supra*). Who was to be protected by regulations controlling working conditions and wages of these farm laborers who worked for meager wages and under such barbaric conditions? The answer is plain, even though masked at times by euphemisms that cast the objective as avoiding conditions which would jeopardize the reputation or patronage of the employment service as just another private employment agency. Attorney General's opinion, note 7, *supra,* at 414.

Thus from the "legislative" history and from the regulations themselves it is plain that they were intended to confer an interest upon migrant farm workers such as Plaintiffs here. There

25. 42 U.S.C.A. § 1983, see note 33 and accompanying text, *infra.*

being no explicit indication in the regulations or the Act that the workers were to have the opportunity to protect such conferred interest is not decisive since the existence of such an explicit grant of a remedy is not necessary. A civil remedy may be given to those protected by statutes or regulations by implication. Its sources are broad, including the language and the apparent purpose of the Act and regulations, as well as its "legislative" history. See Note, Implying Civil Remedies From Federal Regulatory Statutes, 77 Harv.L.Rev. 205 (1963).

This implication of a private civil remedy was first recognized by the Supreme Court in 1916 in Texas & Pac. Ry. v. Rigsby, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874, where the Court held that an employee could recover damages under the Federal Safety Appliance Act. Since *Rigsby* civil remedies have been implied in areas [26] ranging widely from airline regulations [27] to control of the trading in corporate securities [28] and based upon regulations [29] as well as statutes.

This Act, its setting and the regulations call imperatively for implied remedies here if the purpose of the regulations—the protection of migratory farm workers—is to be achieved. Experience proved the need for more and stringent standards. Standards were stated and stated in terms relating to workers, their pay and conditions of living and transportation. Who, more than the workers, would be the expected beneficiaries of them? What more effective way will there be to eradicate conditions so deplored? See Attorney General's opinion note 7, *supra*, at 409. What better way will there be to eliminate the problem of poor workers responding to "Clearance Orders", journeying hundreds of miles across the country to accept work and the advantage of the benefits promised by the laws of the United States only to find that the promise is a fraud? Absent an implied remedy, the workers have no protection. They would not have even the protection of a criminal sanction. And, civil suits under local concepts hardly meet these conditions.

It is unthinking that Congress, obviously concerned with people, would have left the Secretary with only the sanction of cutting off funds to the state. Moreover, the private civil remedy is a method of policy enforcement long honored explicitly in statutes and by implication with the help of courts. Congress more and more commits to individuals, acting as a private Attorney General, the effectuation of public rights through relief to individuals. See Pettway v. American Cast Iron Pipe Co., 5 Cir., 1969, 411 F.2d 998; Jenkins v. United Gas Corp., 5 Cir., 1968, 400 F.2d 28. (Cases under Title VII of the 1964 Civil Rights Act, 42 U.S.C.A. § 2000e-3(a)).

Nevertheless, Naples Farms, the employer, argues that, even if there is a private civil remedy under the statute and regulations against the state officials, there is no such remedy against it since neither the regulations nor the statute imposes any duty on the employer. It is true that the basic obligation for insuring that the housing and other working conditions meet the re-

---

**26.** See Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, 1944, 323 U.S. 210, 213, 65 S.Ct. 235, 237, 89 L.Ed. 187, 193, under the Railway Labor Act, 45 U.S.C.A. § 151 *et seq.*

**27.** See e. g., Fitzgerald v. Pan American World Airways, 2 Cir., 1956, 229 F.2d 499; Mortimer v. Delta Airlines, N.D. Ill., 1969, 302 F.Supp. 276 [July 24, 1969].

**28.** See e. g., Hooper v. Mountain States Sec. Corp., 5 Cir., 1960, 282 F.2d 195; Errion v. Connell, 9 Cir., 1956, 236 F.2d 447.

**29.** It has often been held that civil remedies may be implied from regulations, as well as statutes. See, e. g., Hooper v. Mountain States Sec. Corp., 5 Cir., 1960, 282 F.2d 195, 200–201; Mortimer v. Delta Airlines, N.D.Ill., 1969, 302 F.Supp. 276 [July 24, 1969].

quirements of the regulations is placed on the state agency. (See note 5, *supra*). This does not mean, however, that the employer has no duty. It is, after all, the working, pay, living and transportation conditions of that requesting employer which the state agency is to check and certify. And, if the employment system is to be workable,[30] he has a duty not to intentionally mislead the state officials. When he does so and receives workers he is implicated with such officials.

It is just this type of intentional conduct Plaintiffs allege.[31] Whether Plaintiffs can prove this claim is another matter,[32] but the complaint is more than adequate to resist a motion to dismiss. Pred v. Board of Public Instruction, 5 Cir., 1969, 415 F.2d 851 and cases cited there at note 1.

Defendant Cooper, the Lee County Sanitarian, also urges that there can be no private cause of action against him under the Wagner-Peyser Act and

30. The great reliance that must be placed in the good faith of the employer is illustrated by a memorandum sent by the Department of Labor to all state employment security agencies on July 26, 1967. The memorandum explained the regulations and in part provided:
   "The State agency has the basic responsibility of assuring that all housing used, or to be used, for workers recruited through the interstate clearance process is inspected. However, the workload imposed by this policy may preclude State agency inspection of each unit on a timely basis. Employer certifications and the assistance of other responsible State and/or local agencies may therefore be used to reduce State agency workloads. To assure that the responsibility imposed by the Secretary's regulations has been met, however, State agency personnel must inspect as large a percentage of affected employer housing as possible. Where an agreement with a cooperating agency provides for inspection of all farm labor housing, and such agency has an acceptable inspection program, inspection reports supplied by such agencies may be accepted in lieu of an inspection by the State agency. (Employer certification and inspection by other agencies are explained below.)"

31. Paragraph 14 of Plaintiffs' complaint provides:
   "14. Sometime before October 30, 1967, Defendant CREEL, seeking the gratuitous benefits of the procedures for the interstate recruitment of agricultural workers by the Florida State Employment Service, prepared a Clearance Order. He knew at the time he prepared this form that the housing he designated in his Order did not comply with regulatory standards of 20 CFR § 602.9(d), nor did he have any intention of bringing the housing into compliance with law. Further, he intend-

ed that he would not pay the minimum wage required by 29 USCA 201 et seq., or the wages and hours represented in the Clearance Order."

32. Plaintiffs also allege that all Defendants were a part of a conspiracy to deprive them of the benefits of the regulations and, in an attempt to state a cause of action under 42 U.S.C.A. § 1985, to deprive them of equal protection of the laws. The allegations of conspiracy appear in paragraph 20 of Plaintiffs' complaint.
   "20. At all times relevant the named Defendants acted under color of the statutes, ordinances, regulations, customs, or usages of the State of Florida and its legal subdivisions and Defendants SHEBEL, MOSS, TOOKE, BULL, and COOPER [the employees of the state agency] did act in their official capacities as officers under the laws of the State of Florida. At all times relevant the Defendants acted jointly in concert and in conspiracy with one another causing Plaintiffs to be deprived of their contractual and federally guaranteed rights."
   Defendants contend that the allegations are not specific enough to state a claim. In support of this proposition they rely upon such cases as Powell v. Workmen's Compensation Board, 2 Cir., 1964, 327 F.2d 131 and Neff v. World Publishing Co., 8 Cir., 1965, 349 F.2d 235, 257. The idea that the requirement for specificity in the pleading of conspiracy is like that for pleading fraud is not followed by us. See Pred v. Board of Public Instruction, 5 Cir., 1969, 415 F.2d 851, 854 n. 11: Due v. Tallahassee Theatres, Inc., 5 Cir., 1964, 333 F.2d 630, 631. The remedy is not dismissal, which halts the proceedings at the Courthouse door. The remedy is full use of flexible discovery. Cf. Surowitz v. Hilton Hotels Corp. 1966, 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807.

the regulations since he did not participate in any way with this employment service. But, it is not that simple. The complaint charges that Cooper knew that Plaintiffs were being deprived of housing and working conditions to which they were entitled. And, that he sought to deprive them of means of obtaining redress for their grievances.

Certainly, if Cooper did act in concert with the employer and other state officials, he is subject to similar sanctions. Moreover, the complaint asserts a bold, flagrant retaliation against Plaintiffs for Gomez having sought redress. This type of coercive retaliation, for which appropriate remedies have been offered, has traditionally been in violation of similar statutes setting "job standards" in other areas. See e. g., Nash v. Florida Indus. Comm'n, 1967, 389 U.S. 235, 238, 88 S.Ct. 362, 365, 19 L.Ed.2d 438, 442 (NLRA); Mitchell v. Robert De Mario Jewelry, Inc., 1960, 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (FLSA); Pettway v. American Cast Iron Pipe Co., 5 Cir., 1969, 411 F.2d 998, 1005–1007 (Title VII of the 1964 Civil Rights Act). At this stage, we see no reason why such conduct does not give rise to relief here.

We are not, however, limited to the existence of an implied civil remedy under these migratory-labor regulations to hold that Plaintiffs have stated a claim for which relief can be granted against either Naples Farms, Mr. Cooper, or the employees of the Florida State Employment Agency. Under the Civil Rights Acts, Congress has provided a general statute giving a civil remedy to those persons who are deprived "under color of law" of "any rights * * * secured by the Constitution and laws [of the United States]." [33] 42 U.S.C.A. § 1983.

The state action necessary under § 1983 clearly exists as to the employees of the Florida State Employment Agency and the Lee County Sanitarian, Mr. Cooper. Moreover, no difficulty in regards to state action arises as to Naples Farms in view of the positive charges that must be credited.

The complaint alleges—and with sufficient specificity (see note 32, *supra*)—that all defendants acted jointly and as a part of a plan or conspiracy to deprive Plaintiffs of the rights granted them by the regulations. (See note 32, *supra*). The Supreme Court in United States v. Price, 1966, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267, in construing 18 U.S.C.A. § 242, the criminal counterpart to § 1983, held that:

"Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute. To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents." 383 U.S. at 794, 86 S.Ct. at 1157, 16 L.Ed.2d at 272.

See also Baldwin v. Morgan, 5 Cir., 1961, 287 F.2d 750.[34]

Even with the necessary State action present for all parties, Defendants contend, and the District Court held, that § 1983 is not available to Plaintiffs since

---

**33.** This was § 1 of the Civil Rights Act of 1871 and it provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."
42 U.S.C.A. § 1983.

**34.** It warrants emphasis again that the use of the magic word "conspiracy" does not necessarily take it out of § 1983 and throw it into § 1985. On usual principles of agency persons may be held accountable for the acts of others under § 1983. Most times such a combination, concerted action, etc. would constitute "conspiracy", too.

"the type of 'rights' which the plaintiffs alleged they were denied or deprived are not those protected under the Civil Rights Acts relied upon." Order of District Court dismissing complaint.

It is true that § 1983 has quite often been used as a means of protecting *Constitutionally* guaranteed rights, particularly in the area of equal protection of the Negro.[35] But the language of this civil rights statute is broad: it is a violation of the statute to transgress *"any rights, privileges, or immunities secured by the Constitution and laws"* of the United States. 42 U.S.C.A. § 1983 (emphasis added). Moreover, the Supreme Court in Peacock v. City of Greenwood, 1964, 384 U.S. 808, 86 S.Ct. 1800, 16 L. Ed.2d 944, clearly indicated that § 1983 was applicable when statutory, as well as, constitutional "rights, privileges and immunities" were involved. The Court said: "Under 42 U.S.C.A. § 1983 * * * the officers may be made to respond in damages not only for violations of rights conferred by federal equal civil rights laws, but for violations of other federal constitutional and statutory rights as well." 384 U.S. at 829–30, 86 S.Ct. at 1813, 16 L.Ed.2d at 958. See also, Sheridan v. Garrison, 5 Cir., 1969, 415 F.2d 699, at 705, 706.

Despite these authorities and the clear purport of the language of the statute,

Defendants argue that § 1983 does not provide a basis for recovery. The argument is based on statements in several cases that § 1983 does not protect property rights.[36]

We need not determine the extent to which "property" rights are outside of § 1983 recourse [37] since the essence of the claim here is the denial of rights of an essentially personal nature, touching such intimate things as living and eating conditions, freedom from the marks of modern peonage, work at starvation wage levels in degrading poverty.

The aim of the Plaintiffs, through appropriate judicial remedies, is to secure for themselves the fundamentals of human dignity. They seek to protect their right to decent housing and sanitary living conditions so they and their children may be free of disease. They seek to protect their ability to work for the wages which Congress has in effect determined to be the minimum to which they are entitled. They seek sanctions for having been deprived of some of those few protections designed by Congress to lift them out of economic-sociologic peonage. Such fundamental human, highly personalized rights are just the stuff from which § 1983 claims are to be made.

In addition to the argument that Plaintiffs have stated no claim for

35. See Monroe v. Pape, 1961, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492.

36. Hague v. C. I. O., 1939, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423; Holt v. Indiana Mfg. Co., 1899, 176 U.S. 68, 20 S.Ct. 272, 44 L.Ed. 374; City of Boulder v. Snyder, 10 Cir., 1968, 396 F. 2d 853; Howard v. Higgins, 10 Cir., 1967, 379 F.2d 227; Ream v. Handley, 7 Cir., 1966, 359 F.2d 728; Fuller v. Volk, 3 Cir., 1965, 351 F.2d 323; Booth v. General Dynamics Corp., N.D.Ill., 1967, 264 F.Supp. 465; · Pudlik v. Public Service Co., D.C.Colo.1958, 166 F.Supp. 921.

37. See Bussie v. Long, 5 Cir., 1967, 383 F. 2d 766, 769. See also Atlanta Bowling Center, Inc. v. Allen, 5 Cir., 1968, 389 F.2d 713.

Without intimating our position on it, the "property" limitation on § 1983 first articulated in Justice Stone's concurring opinion in Hague v. C. I. O., 1939, 307 U.S. 496, at 529–532, 59 S.Ct. 954, 83 L.Ed. 1423, at 1444–1445, may be giving away to changing concepts of "property". See Reich, The New Property, 73 Yale L.J. 733 (1964). For examples of what some consider to be an erosion see Damico v. California, 1968, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (aid to families with dependent children); Pred v. Board of Public Inst., 5 Cir., 1969, 415 F.2d 851 (job as a school teacher); Mansell v. Saunders, 5 Cir., 1967, 372 F.2d 573 (garbage district franchise).

which relief may be granted, Defendants argue that the Trial Court was correct in holding that it had no jurisdiction to hear the claims, even if such claims were stated, since the requisite jurisdictional amount is not claimed, 28 U.S.C.A. § 1331.[38]

But that is not the end of the matter since 28 U.S.C.A. § 1343 and its interplay with 42 U.S.C.A. § 1983 adequately supply jurisdiction.[39] Additionally, jurisdiction is established by 28 U.S.C.A. § 1337,[40] which provides that the District Court has original jurisdiction of any cause of action arising under a statute regulating interstate commerce. There is no requirement for any jurisdictional amount. Almost every conceivable test of "arising under" is met. The claim is a direct assertion of federal statutory

38. "(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.

(b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff is finally adjudged to be entitled to recover less than the sum or value of $10,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interests and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff."
28 U.S.C.A. § 1331(a), (b).

39. 28 U.S.C.A. § 1343 provides:
"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;

(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."
28 U.S.C.A. § 1343.

This section has traditionally been the basis for jurisdiction of claims arising under the Civil Rights Act including § 1983—it was enacted specifically to provide federal jurisdiction in cases arising under these statutes. See Note, Federal Judicial Review of State Welfare Practices, 67 Colum.L.Rev. 84, 111–115 (1967). Section (3) tracks the language of § 1983 except for the variation that gives the district courts jurisdiction of suits to redress only deprivations of rights secured by laws *providing for equal rights.*" We do not here determine whether the claim based on violation of the regulations of the Secretary would come within the proviso of "equal rights", nor consider the significance of the Supreme Court's reservations on the point in King v. Smith, 1968, 392 U.S. 309, at 313 n. 3, 88 S.Ct. 2128, 2131 n. 3, 20 L.Ed.2d 1118, 1123, n. 3. See Cover, Establishing Federal Jurisdiction in Actions Brought to Vindicate Statutory (federal) Rights when no Violation of Constitutional Rights are Alleged. (Unpublished paper submitted to Columbia Center on Social Welfare Policy and Law); Note, Federal Judicial Review of State Welfare Practices, 67 Colum.L.Rev. 84, 111–115 (1967).

We need not do this since § 1343(4) does provide jurisdiction for all claims stated under § 1983, although operating as a conduit through which other statutory rights are protected, is itself an "Act of Congress providing for the protection of civil rights."

40. "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies." 28 U.S.C.A. § 1337.

(regulatory) rights. Also, construction one way or the other will have a direct bearing on recovery or non-recovery. Florida East Coast Ry. Co. v. Jacksonville Terminal Co., 5 Cir., 1964, 328 F.2d 720, cert. denied, 379 U.S. 830, 85 S.Ct. 59, 13 L.Ed.2d 38; cf. Mungin v. Florida East Coast Ry., 5 Cir., 1969, 416 F.2d 1169. The complaint both directly invokes the regulations as a basis for relief and brings the construction of the Wagner-Peyser Act and the regulations into direct question. The whole structure is to regulate the interstate flow of workers to places of need from places of surplus. This is interstate commerce in its plainest form.[41]

Thus we hold that the complaint does state claims for which relief may be given and that on the basis of this complaint the District Court has jurisdiction to hear these claims. Now the real facts —not just what the lawyers say the facts are—must be ascertained. And, after these facts are determined the remedies to be given, if—and the if may be substantial—Plaintiffs can prove their case, must be determined. These remedies may be, and probably will be, different for the various Defendants. Thus, when the real facts are determined, it may be that money damages, which are appropriate against the private defendants may not be appropriate for all defendants. But, we leave this case to the superintendence of the Trial Judge without even a murmur of how it should come out either on the intrinsic merits or the relief to be granted.[42]

Rehearing Denied Sept. 19, 1969.

41. Programs administered by the Department of Labor have uniformly been claimed to arise under Acts of Congress regulating interstate commerce. See e. g., Felter v. Southern Pac. Co., 1959, 359 U.S. 326, 79 S.Ct. 847, 3 L.Ed.2d 854; Serio v. Liss, 3 Cir., 1961, 300 F.2d 386.

42. A party should be granted all relief to which he is entitled even if the relief has not been demanded. See F.R.Civ.P. 54 (c); Mungin v. Florida E. C. Ry. Co., 5 Cir., 1969, 416 F.2d 1169, 1178; Equity Capital Co. v. Sponder, 5 Cir., 1969, 414 F.2d 317, 319 n. 1; Molnar v. Gulfcoast Transit Co., 5 Cir., 1967, 371 F.2d 639.