**Claudio RAMIREZ, et al.,
Plaintiffs-Appellants,**

v.

**David RUELAS, etc., et al.,
Defendants-Appellees.**

No. 83–2368.

United States Court of Appeals,
Fifth Circuit.

July 12, 1984.

James A. Herrmann, Harlingen, Tex., Lawrence J. Sherman, Washington, D.C., for plaintiffs-appellants.

Jim Mattox, Atty. Gen., Oscar H. Villarreal, Maureen Bucek, Asst. Attys. Gen., Austin, Tex., for defendants-appellees.

Before RANDALL, TATE, and WILLIAMS, Circuit Judges.

TATE, Circuit Judge:

The plaintiffs, a group of migrant agricultural workers, brought suit seeking monetary and injunctive relief against the defendants, the executive officer and three employees of the Texas Employment Commission (the "Commission"), for an alleged deprivation of the plaintiffs' rights under the Wagner-Peyser Act, 29 U.S.C. § 49 *et seq.*, and its implementing regulations, 20 C.F.R. § 653.1 *et seq.*, and the Farm Labor Contractor Registration Act, 7 U.S.C. § 2041 *et seq.* (the "Labor Contractor Act"), and its implementing regulations, 29

C.F.R. § 40.1 *et seq.*[1] The plaintiff migrant workers' complaint bases its claim for relief on events arising out of their recruitment in Texas by the state Commission for employment in Delaware and alleged deficiencies by the defendant Commission employees in performing their duties with regard thereto.

The district court, after a trial of the matter without a jury, generally found that the state Commission had no duty to assure safe and adequate transportation for the migrant workers (instead, a responsibility of a federal agency), and that, in those circumstances where the defendants had a statutory or regulatory duty as to the plaintiffs' claims, the defendants had been negligent in some respects in their treatment of the complaints they received from the migrant workers, but that their negligence was not the proximate cause of the injuries suffered by the plaintiffs. Accordingly, the district court entered judgment for the defendants.

The migrant workers appeal, contending (1) that the district court erred in finding that the state Commission defendants did not also have a duty under the cited Acts and their implementing regulations to verify or guarantee the safety and adequacy of the transportation used to take the migrant workers to their Delaware jobsite, and (2) that the district court's finding that the defendant's negligent discharge of their statutory and regulatory duty to investigate the plaintiffs' complaints about the transportation and the jobsite did not proximately cause the plaintiffs' injuries was clearly erroneous. Though we, like the district court, are indeed not without compassion for the plight of the plaintiffs, we affirm.

*Factual Context*

The events giving rise to this litigation present a vivid picture of how an expensive and complex bureaucratic web of agencies can fall short of their intended purpose, and, in the process, leave their alleged beneficiaries—often persons without the resources to help themselves—unprotected from those who would exploit them. We include here a summary of the facts found by the district court in its excellent and well-reasoned opinion.

In January 1980, H.P. Cannon & Sons, Inc. ("Cannon"), a Delaware employer, anticipated that it would need a number of farm workers to assist in the harvest of its pepper crop in Delaware. Cannon arranged to recruit workers through the Department of Labor's "United States Employment Service" by specifying the terms of its employment offer in a "Clearance Order."[2] The clearance order was received in the McAllen, Texas office of the Texas Employment Commission (the "Commission"), a state employment service agency established by Texas as contemplated by the Wagner-Peyser Act, 29 U.S.C. § 49c. Cannon's order named Andres Molina as the crewleader selected by Cannon to transport the recruited workers from Texas to Delaware.

In June and July of 1980, representatives from each of the plaintiff families went to the Commission's McAllen office seeking employment. The defendant Ruelas, a Commission employee, informed them of the Cannon offer and told them that they should apply to the crewleader, Andres Molina. The plaintiffs met with Molina, who approved them for the job, and were given

**1.** The events in this suit occurred in July, 1980, prior to Congress' revision of the Farm Labor Contractor Registration Act in 1982. The plaintiffs' claims under that Act are thus considered under the pre-amended provisions of that law. The extensive 1982 revisions to the Labor Contractor Act are codified in 29 U.S.C. § 1801 *et seq.* *See* note 7 *infra.*

**2.** The Wagner-Peyser Act established the United States Employment Service as a type of "clearinghouse" to match available jobs in some parts

of the country with available workers in other parts. 29 U.S.C. § 49; *see Gomez v. Florida State Employment Service,* 417 F.2d 569, 570–71 (5th Cir.1969). This matching of jobs with workers is accomplished by the transmission of job offers described in "clearance orders" through the regulatory network to the state employment service agencies, also provided for by the Act, *see* 29 U.S.C. § 49c, in areas where workers can be recruited.

copies of Cannon's clearance order by the Commission employees.

Molina was a registered farm labor contractor under the then-existing provisions of the Labor Contractor Act, *see* 7 U.S.C. § 2044 (now repealed, *see* note 1, *supra*), and was further authorized by the Department of Labor to transport migrant workers. In the spring of 1980, the Texas Commission employees had assisted Molina in obtaining transportation authorization for his truck by providing him with the Department of Labor's vehicle inspection form and the names of two garages authorized to complete the report.[3] The state Commission employees played no role, however, in the approval of the authorization of Molina's truck for transporting migrant workers. Once Molina completed the necessary forms, Commission employees only forwarded the transportation forms to the appropriate Labor Department office in Dallas for consideration.

Molina notified the plaintiffs that they would be departing from his residence on the evening of July 30, 1980. As the plaintiffs arrived, their belongings were packed onto Molina's 15-foot flatbed truck, *i.e.*, the vehicle inspected under the Labor Department regulations and certified to transport migrant workers. Although the truck was already quite full from the plaintiffs' belongings, Molina instructed the workers (who numbered about fifty, including approximately twenty children) to pack themselves onto the bed on the back of the truck. With no choice but to climb aboard the truck or forego this chance for employment, the plaintiffs protested and boarded the truck.

The conditions in the truck during the journey were inhumane by any standard. Most of the workers carried on the truck had no place to sit. The truck itself was covered by a plastic tarpaulin with no opening for ventilation, though the journey occurred in the heat of the summer, and no

interior light. Exhaust fumes entered the bed area of the truck through the *floor* boards.

Once underway, Molina stopped the truck after dawn at George West, Texas. One of the plaintiffs, Claudio Ramirez, called Roy Fernandez of the Hidalgo, Texas office of a farm worker assistance organization (not affiliated with the Commission) to report the truck's conditions. Ramirez asked Fernandez to call the Commission office in McAllen and have the truck intercepted and stopped.

Fernandez called the defendant Ruelas at the Commission's McAllen office and conveyed Ramirez's message. Some confusion apparently resulted, as both Fernandez and Ruelas ended the conversation with the impression that the other would attempt to handle the problem. Ruelas informed his supervisors at the McAllen office of the Fernandez call, but the supervisors merely asked whether the workers had been told to refer their problems to local employment offices. The Commission employees did nothing further in response to the Fernandez call.

The conditions in the truck grew worse as the journey continued. The plaintiffs had little water, and many families did not have enough food. The workers often slept on the truck, and, on one stop in North Carolina, were forced to sleep outside without protection from the elements. Relations between the Molinas and the plaintiffs grew tense. Five days after it left Texas, the truck at last reached Delaware.

The living conditions at the Delaware jobsite also fell short of those promised in Cannon's clearance order. Many of the promised apartments lacked furniture and air conditioning; most were filthy. After the plaintiffs' arrival, Cannon representatives accused Claudio Ramirez of causing trouble on the journey and told him to leave the jobsite by the following morning.

---

**3.** The "vehicle mechanical inspection report" includes a list of 32 minimum standards which the transporting vehicle sought to be certified must meet. From the face of Molina's truck inspection report, it appears that the vehicle met the minimum standards although, as the facts will show, it is equally apparent that the truck did *not* in fact meet these standards.

With the aid of a local clergyman, Ramirez and his family managed to safely return to Texas.

On July 23, 1980, Ramirez filed a formal complaint in the Commission's McAllen office against Cannon and the Molinas for their treatment of the migrant workers. The complaint was forwarded to the enforcement division of the Department of Labor. The defendant Ruelas also called a Cannon representative to inquire about the camp and truck conditions reported by Ramirez. The Cannon official said he had received no complaints about the truck, and that Ramirez "had left" of his own accord. Ruelas did not pursue the matter further with Cannon, nor did he inform the Delaware employment service (the Delaware counterpart to the Texas Employment Commission) of the complaints.[4]

On February 10, 1981, the plaintiffs filed suit under the Wagner-Peyser Act, 29 U.S.C. § 49 *et seq.* and under 42 U.S.C. § 1983 against Cannon, Molina (the crewleader), Molina's sons (who assisted Molina in transporting the plaintiffs), and the Commission defendants alleging deprivations of their rights under the Wagner-Peyser and Labor Contractor Acts. The plaintiffs settled their claims against Cannon and voluntarily dismissed the Molinas, who did not answer the complaint. The district court after a trial entered judgment in favor of the Commission defendants, from which the plaintiffs now appeal.

## I. *Statutory and Regulatory Context*

In 1933, Congress enacted the Wagner-Peyser Act establishing the United States Employment Service as an agency of the Labor Department in order to create a comprehensive interstate system for the recruitment and effective transfer of available laborers to available jobs. We described the objectives of this statute and its regulatory progeny, and the conditions that they were designed to eliminate, in *Gomez v. Florida State Employment Service*, 417 F.2d 569, 572–73 (5th Cir.1969), where we stated:

These objectives were to be accomplished through that well-known device of "cooperative federalism" and grant-in-aid system. Under the particular system established by the Act, the state agencies, which are substantially funded by federal money and are subject to the regulations of the Secretary of Labor, process applications for workers and, after concentric local searches to fill the application, send the request through the interstate facilities of the United States Employment Service. Because of its information about the supply of labor in all parts of the country, the Service then is able to forward the application—"Clearance Order"—to a state agency that can fill the request.

In 1951, reflecting the growing national concern about the deplorable condition of many migratory Americans, usually Negroes or Mexican-Americans, who harvest the food for the nation's tables, the Secretary of Labor first promulgated referral standards for farm workers. (16 F.R. 9142). The standards, as those that followed, were obviously designed to protect those workers that were acquired when farmers voluntarily sought the benefits of this federal system.

But conditions of farm workers apparently remained much the same despite these and other efforts. Their plight was vividly described by the Secretary of Labor in his letter seeking the Attorney General's opinion on the Secretary's power to promulgate what became substantially the regulations in question here. The opinion referring to the Secretary's letter used these strong words: The "housing provided for migrant farm workers 'has frequently been overcrowded, unsanitary, lacking beds and bedding, unheated, and a fire hazard. Some migrants have even been required to sleep in the open, completely exposed to the elements. These conditions breed dis-

---

**4.** Within two months of their arrival, the migrant workers were forced to leave the Cannon job because Cannon was not providing enough work for them to subsist.

ease and thus endanger the health of the whole community.' "

As we noted in *Gomez*, the regulations enacted to implement the Wagner-Peyser Act impose a "basic duty" on the state employment service agencies funded under the Act to "check and certify" that the conditions promised by the employer measure up to regulatory standards. *Gomez, supra*, 417 F.2d at 576–77. This court went on to hold that the Wagner-Peyser Act creates a private civil remedy by which the Act's intended beneficiaries can seek redress against those persons who violate the duties imposed on them by the Act or its regulations. *Gomez, supra*, 417 F.2d at 577–79.

In a further response to the poor conditions to which migrant and seasonal agricultural workers were too often subjected, Congress enacted the Farm Labor Contractor Registration Act to set enforceable standards for those who recruit, hire, or transport migrant workers. That Act, formerly codified at 7 U.S.C. § 2041 *et seq.*, and its implementing regulations (29 C.F.R. § 40.1 *et seq.*) imposed registration requirements on farm labor contractors and transportors and prescribed certain minimum standards of conduct for those persons. These regulations also provided that labor contractors must obtain authorization in order to transport or house migrant workers. *See* 29 C.F.R. § 40.19 (transportation) and 29 C.F.R. § 40.20 (housing).

The essence of the plaintiffs' contentions on appeal is that the defendants denied them the protections provided for migrant workers in these Acts and their regulations, and that, pursuant to our holding in *Gomez*, they are entitled to both monetary and injunctive relief for these violations. More specifically, they assert that the defendants violated their regulatory duty to "check and certify" that Molina's truck was a safe and adequate mode of transportation and their duty to investigate the workers' complaints about the conditions of the truck and the Cannon jobsite. We discuss each of the contentions below.

## II. *Inspection of Molina's Truck*

In response to the plaintiffs' claim that the Commission employees should be enjoined to inspect vehicles to be used for transport of migrant workers, the district court held that:

> [The Commission] has no substantive role in the certification of crewleaders for transporting workers.... Under the existing [regulatory] system, the defendants had no duty to ensure the plaintiffs' safe transportation other than their obligation, which they fulfilled, to verify the crewleader's Labor Department authorization to transport workers. They are not responsible for failing to recognize the inadequacies of a system in which they participate as mere functionaries.

The plaintiff migrant workers challenge this ruling as erroneous, asserting that the state agency should have some duty, perhaps implied under *Gomez, supra*, to check and certify that the transportation mentioned in the clearance order was safe and adequate to carry the migrant workers seeking the job referral. They argue that the actions of the Commission employees in ensuring only that the vehicle to be used for transportation has been inspected and certified according to the Labor Department's guidelines, as was Molina's truck, were not sufficient to execute their statutory duty to protect migrant workers.

■ The procedures through which Molina's truck was authorized for use as a vehicle to transport migrant workers concededly did not achieve their intended purpose of requiring safe and adequate transportation in the circumstances of this case. But the failure of the regulatory procedures to achieve their purpose does not mandate a conclusion that *these defendants* failed to carry out a regulatory duty for which they may be subject to liability under *Gomez*. As the district court correctly concluded, the duty to check the adequacy of the transportation used by crewleaders fell to others under the regulatory scheme in force at the time of these events. In all likelihood, however, the real

failure was inherent in the regulatory scheme itself.

Under the implementing regulations of the Wagner-Peyser Act that relate to "agricultural clearance order activity", state agencies such as the Texas Employment Commission are not charged with the duty to certify farm labor contractors such as Molina to transport migrant workers. *See* 20 C.F.R. § 653.500–503. Although Molina obtained the forms for his transportation authorization from Commission employees, the registration and authorization for transportation procedures for farm labor contractors are the responsibility of the Secretary of the Department of Labor. *See* 29 C.F.R. §§ 40.19, 40.42.[5] Thus, the only duty imposed on these Commission employees either by statute or regulation was the duty to provide Molina with the necessary transportation authorization forms and send these forms when completed to the appropriate Labor Department officials.

What is troubling, however, is that Molina's truck *could* be authorized for transportation of migrant workers even though all existing procedures were apparently followed. The regulations under the Labor Contractor Act provide that a vehicle cannot be authorized to transport migrant workers unless the person seeking to certify the vehicle submits:

> [w]ritten proof that every such vehicle is in compliance with all applicable Federal and State safety and health standards and with the rules and regulations promulgated by the Bureau of Motor Carrier Safety, Federal Highway Administration of the U.S. Department of Transportation.

29 C.F.R. § 40.19(a)(3)

The transportation regulations referred to in the quoted regulations provide detailed standards for the parts and accessories necessary for safe operation, 49 C.F.R. § 398.5, and for inspection and maintenance of the vehicles used to transport migrant workers. 49 C.F.R. § 398.7. These detailed standards are embodied in the Labor Department's "vehicle mechanical inspection report" that must be completed by an authorized garage. Yet, the evidence indicated that Molina's truck failed to meet many of these standards and that far too many workers were transported by the truck.

The central gap in this regulatory scheme lies in its failure either to authorize particular vehicles to carry a specific number of passengers or to specify the passenger-carrying capacity of the vehicles to be used in a clearance order stating that transportation is provided.[6] In short, the regulations in effect at the time of these events failed to match the available authorized transportation (Molina's truck) with the number and needs of the workers recruited to fulfill the clearance order.[7]

---

5. Thus, as the district court observed, if relief were deemed appropriate, the responsible parties from the Department of Labor would have to be parties before the court.

6. The district court also noted another potential flaw in the regulatory system in the "authorized" vehicle inspection stations. Since these are the stations that conduct the actual physical investigation of the vehicle, it is imperative that they honestly and conscientiously apply the standards promulgated by the Labor Department. Given that Molina's truck passed all 32 points of inspection, the district court speculated that "if the garage which inspected Mr. Molina's vehicle were authorized by the Department of Labor, the authorization scheme [for garages] is inadequate."

7. We note that since the events in this case, Congress has passed an extensive revision of the Farm Labor Contractor Act, now codified at 29 U.S.C. § 1801 *et seq.* The legislative history of this revision recites continued evidence of abuse in the recruitment and transportation of migrant workers, *see* H.R. No. 97–885, 97th Cong., *reprinted in* 1982 U.S.Code Cong. and Adm. News 4548–49, and notes that a new statutory provision charges the Secretary of Labor with an affirmative duty to develop standards "which will protect the health and safety of migrant and seasonal agricultural workers while they are being transported." *Id.* at 4565. The legislation itself specifically directs the Secretary to:

> Consider, among other factors—
> (i) the type of vehicle used,
> (ii) *the passenger capacity of the vehicle*,
> (iii) the distance which such workers will be carried in the vehicle,
> (iv) the type of roads and highways on which such workers will be carried in the vehicle,

Because, as we have noted, the state Commission defendants were not charged with any statutory or regulatory duty to certify the safety and adequacy of vehicles used in the transportation of migrant workers, we find that the district court correctly refused to grant relief insofar as the plaintiffs' first contention.

### III. *The Workers' Complaints*

■ The district court found that the defendant Commission employees (a) negligently failed to respond to the call from Fernandez reporting the inhumane conditions on Molina's truck and (b) improperly failed to follow-up on Ramirez's complaint about the Cannon jobsite, considering the implications of that complaint as to the migrant workers (recruited by the Commission employees in Texas) who were still at the Cannon jobsite in Delaware. The district court also found, however, that damages were improper in both situations since the conduct of the Commission employees

did not proximately cause any damage to the plaintiffs.

As to the complaint from the road relayed to the defendants by Fernandez, the district court reasoned that "no action [on the defendants'] part would have ameliorated the conditions of the trip, [thus the defendants'] negligence cannot be said to have caused the plaintiffs' damage." Similarly, the court found that the failure of the defendants to check-up on the remainder of the crew after the Ramirez complaint, though "improper", did not cause any injury "because the Delaware employment service was contacted by the plaintiffs and was better able to investigate the situation." The plaintiffs claim that the district court's findings of "no causation" were clearly erroneous, and that they therefore should have been awarded damages. We disagree.[8]

The injuries suffered by the plaintiffs on their journey to Delaware were proximately caused by the unscrupulous treatment

---

(v) the extent to which a proposed standard would cause an undue burden on agricultural employers, agricultural associations, or farm labor contractors.

29 U.S.C. § 1841(b)(2)(B) (emphasis added).

In accordance with this mandate, the Secretary of Labor, with regard to trucks such as Molina's, has required that the vehicle meet the standards "prescribed under section 204(a)(3a) of the Interstate Commerce Act." 29 C.F.R. § 500.102(c). The Interstate Commerce Act standards adopted by reference provide as follows:

49 C.F.R. § 398.4(g)(5) states:

*Maximum passengers on motor vehicles.* No motor vehicle shall be driven if the total number of passengers exceeds the seating capacity which will be permitted on seats prescribed in § 398.5(f) when that section is effective. All passengers carried on such vehicle shall remain seated while the motor vehicle is in motion.

49 C.F.R. § 398.5(f)(4) states:

*Seats.* On and after November 1, 1957, a seat shall be provided for each worker transported. The seats shall be: Securely attached to the vehicle during the course of transportation; not less than 16 inches nor more than 19 inches above the floor; at least 13 inches deep; equipped with backrests extending to a height of at least 36 inches above the floor, with at least 24 inches of space between the backrests or between the edges of the opposite seats when face to face; designed to provide

at least 18 inches of seat for each passenger; without cracks more than two inches wide, and the exposed surfaces, if made of wood, planed or sanded smooth and free of splinters.

Finally, the new legislation contains extensive provisions for enforcement of the statute and its regulations through criminal sanctions, administrative sanctions, a private right of action, and a provision through which the Secretary may seek injunctive relief against any violation of the standards. 29 U.S.C. §§ 1851–54.

8. The Commission defendants advance as an additional ground in support of the district court's denial of relief that the district court's findings as to their negligence were clearly erroneous. We find no merit to this contention. As to the complaint from the road, the defendants had reliable information that the plaintiffs were being subjected to terrible conditions on their journey; yet, the defendants did not attempt to contact authorities who could intercept the truck, or even report the complaint to the Department of Labor. As to the Ramirez complaint, the defendants did not pursue the allegations beyond the self-serving denials of the employer Cannon or forward the information to the Delaware employment service office personnel for investigation. From our review of the evidence, we find no clear error in the district court's judgment that the defendants mishandled the complaints.

afforded them by the crewleader Molina and the substandard condition of Molina's truck. Although the Commission defendants failed to make adequate efforts to respond to the plaintiffs' call from the road, the plaintiffs did not establish that these defendants *could* in fact have done anything to prevent or improve upon the conditions from which they were suffering. We note that the plaintiffs did not personally contact the defendants in the Commission's McAllen office, and that no evidence suggested that the defendants had knowledge of the exact whereabouts of the truck or the route it was taking.

Similarly, the record supports the district court's finding that the failure to follow-up on the Ramirez complaint did not proximately cause an injury to the workers who remained in Delaware. Those workers contacted the Delaware employment services office, which was the only employment services agency in a practical position to check the conditions at the Cannon jobsite and verify or reject the workers' allegations. *See Vazquez v. Ferre*, 404 F.Supp. 815, 820 (D.N.J.1975) (noting that the primary responsibility for checking jobsite conditions is placed upon the agency in the state where the employer is located). The Delaware workers' action in contacting the Delaware employment office does not excuse these defendants from their failure to do so, but does support the conclusion that the same action on the part of the Commission defendants would not have lessened the injuries suffered by the migrant workers.

Nevertheless, we hasten to add that, in proper circumstances, a failure by a state employment agency to make an effort to respond to a migrant worker's call for assistance could proximately cause, as a contributing factor, a compensable injury under the Acts and regulations previously discussed. Our holding is thus limited to a finding that the district court's conclusion that causation was not shown is not clearly erroneous in the present case.

IV. *Conclusion*

In summary, a review of the statutes and regulations in force when these events took place indicates that the district court correctly found that these defendants, as members of a *state* employment services agency, were not charged with the duty of approving the adequacy of the transportation provided by crewleader Molina. We further find that, though the district court correctly concluded that the defendants mishandled the plaintiffs' complaints, the district court did not clearly err in finding that the defendants' conduct did not proximately cause injury to the plaintiffs. Finding no basis for the plaintiffs' requested relief as to these defendants, we AFFIRM the judgment of the district court.

AFFIRMED.