**Judith Ann PETERSEN et al.,
Plaintiffs-Appellants,**

v.

**TALISMAN SUGAR CORPORA-
TION et al., Defendants-
Appellees.**

**No. 72–2057.**

United States Court of Appeals,
Fifth Circuit.

May 3, 1973.

Joseph C. Segor, Miami, Fla., Timothy Dyk, Washington, D. C., for plaintiffs-appellants.

William N. Lobel, Miami, Fla., Erle Phillips, Charles Kelso, Atlanta, Ga., for Talisman.

Kirk Sullivan, West Palm Beach, Fla., for Heidtman.

Before TUTTLE, WISDOM and SIMPSON, Circuit Judges.

TUTTLE, Circuit Judge:

Talisman Sugar Corporation, a sugar cane grower and producer, paid passage for approximately 1,000 Jamaican workers to work at and live on its sugar plantation from November, 1971 to March, 1972. The Jamaicans were hired under a contract complying with federal regulations,[1] and were brought to live in a camp near Belle Glade, Florida.

The camp consisted of housing for 1050 in the form of concrete block buildings. It had kitchen facilities, a mess hall, recreation facilities, a chapel, an infirmary, a laundry, and a store. Twice a week, the company brought in a minister to conduct religious services. In the store, it carried a general line of merchandise, including food and sundry items such as clothing. Traditionally municipal functions such as fire protection, sewage disposal, and garbage collection were handled by Talisman. There was a post office in the camp, but there was no public telephone of any kind. Though the company has telephones at its office some six miles from the camp which it allows anybody to use for an emergency, the workers cannot use these phones if they wish to make social or business calls.

The camp is almost totally isolated from the outside world. There are either fences or canals completely surrounding the 38,000 acre tract upon which it is located. Eight miles from the nearest highway and six miles deeper into Talisman's property than the sugar mill, the camp is twenty-five miles from South Bay, the nearest town. Four or five miles beyond South Bay lies the somewhat larger community of Belle Glade. Only one road leads from the camp to the highway, and this road is guarded by company employees. Though persons are admitted if brought to the camp on company business or if they come as friends or relatives of the migrant workers, Talisman has pursued a policy of excluding those it deems "inappropriate."

Every other Saturday, the company furnished transportation to those workers wishing to go into the town of Belle Glade. The sole description of the town on these Saturdays was as follows:

"The streets . . . on Saturday might have half the population of Belle Glade on them . . . 12,000, 15,000 people, something like that; and heaven knows how many of this six to eight thousand Jamaicans that are employed by the various sugar companies are there."

Due to lack of their own transport and the language barrier which confronted them in Belle Glade, as well as their limited financial resources, few Jamaicans left the camp except on these biweekly excursions.

In addition to the Jamaicans, Talisman employed domestic workers including field equipment operators. Some of these field equipment operators requested that Talisman recognize the International Association of Machinists as their bargaining representative. When Talisman refused, on the grounds that many other employees did not support the unionization drive, the field equipment

[1]. These workers were employed under a contract between the British West Indies Central Labor Organization and the Florida Sugar Producers Association which reflected the requirements of regulations issued under the Sugar Act, 7 U.S.C. § 1100 et seq. and the Wagner-Peyser Act, 29 U.S.C. § 49 et seq. The employment was further governed by a temporary immigration permit issued by the Secretary of Labor under the Wagner-Peyser Act that domestic labor was not available to work as sugar cane cutters. By the terms of this permit and the regulations under the Wagner-Peyser Act, the Jamaicans were limited to working as sugar cane cutters and were forbidden to replace striking agricultural workers.

operators struck. When Talisman hired strike replacements, the strikers began picketing the company's property. Shortly thereafter, members of the United Farm Workers Union joined the picket lines outside Talisman's plantation.

Plaintiff-appellants Judith Ann Petersen, Florida counsel to the UFW, David Hernandez, Associate Director of the UFW Ministry, a religious group, and Franklin P. Smith, a Methodist minister associated with the Florida Christian Migrant Ministry, sought to visit the Jamaican cane-cutters during the course of the UFW-Talisman dispute. Miss Petersen was seeking to substantiate reports that the company had been illegally using the Jamaican cane-cutters as field equipment operators.[2] The other two named plaintiffs were supporting this inquiry and wished additionally to present the workers with information concerning their religious organizations.

On February 1, 1972, plaintiffs, accompanied by Father Kerry Robb, an Episcopalian minister, appeared at the entrance of Talisman's property and requested permission to talk with the Jamaican workers in the labor camp. The gatekeeper, defendant Sergio De la Vega, informed them that they would not be permitted to enter without Talisman's permission. After apparently placing a call, De la Vega told the plaintiffs that permission had been denied. Nevertheless, asserting a right to visit the workers in their living quarters, plaintiffs proceeded to drive down the access road toward the camp. Other employees of the company followed them and said that Talisman's general manager, defendant Miguel Cervera, had forbidden them from entering the camp.

Plaintiffs thereupon returned to the main entrance and waited inside the gate on company property until a deputy of defendant William D. Heidtman, Sheriff of Palm Beach County, arrived. The deputy informed the plaintiffs that it was the policy of the Sheriff's office to arrest persons trespassing on labor camp property after being warned off. He said he was acting pursuant to Florida Statute § 821.01, F.S.A., which he read to the plaintiffs as follows:

"Whoever wilfully enters into the enclosed land and premises of another, or into any private residence, house, building or labor camp of another, which is occupied by the owner or his employees, being forbidden so to enter . . . shall be punished by imprisonment not exceeding six months, or by fine not exceeding one hundred dollars."

Although the plaintiffs pointed out that the phrase "or labor camp" has been excised from the statute by the Florida Legislature in 1969, the deputy said that the protection given to "enclosed land" was enough, without more, to justify the arrest. The plaintiffs were arrested at this time, but no charges were pressed. However, after notice of appeal was filed in this case, an information was brought charging plaintiffs with trespass on Talisman's property. The trial judge dismissed the charges on the ground that "to prevent their entry might lead to a condition where employees are subjected to a form of involuntary servitude, wherein the masters decide who may communicate with the servants." State v. Petersen et al., Case No. 72M–8209, filed in the Small Claims-Magistrate Court, Criminal Division, in and for Palm Beach, Florida.

On February 7, 1972, plaintiffs instituted this class action in federal court, seeking a declaratory judgment and an injunction establishing the right of themselves and others similarly situated to visit the Talisman labor camp. Both compensatory and punitive damages were also sought against the defendants.[3] Following a hearing on March 3, 1972, the district court entered an order dismissing the complaint. It

---

2. The UFW had filed a complaint alleging such violations with the Division of Labor, Department of Commerce of the State of Florida.

3. By stipulation of the parties, the plaintiffs dismissed their claims for damages against one defendant, Sheriff Heidtman.

held that Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) barred relief, and that plaintiffs were not proper class representatives, had no right to access to the labor camp under the Sugar Act and the Wagner-Peyser Act, had no standing to assert First Amendment rights of the Jamaican workers to receive information, and had no right of access to the camp under the First and Fourteenth Amendments.

Since the initiation of this suit, Talisman has spent over one million dollars on cane cutting machines, has given up its Labor Department certification for the importation of Jamaican workers, and has offered assurances that no workers will henceforth reside in the camp. The work force allegedly will be reduced permanently from 1,000 to 50 and the workers will commute except when there is reason to stay over. Though the buildings of the camp will not be destroyed, the services formerly provided will be discontinued. The gate will remain guarded, however, and access will continue to be granted only to those having direct business with the company or visiting employees "and those visits are desired by these employees."

### I.  MOOTNESS

■ Plaintiffs sought not only declaratory and injunctive relief from the trial court, but requested that monetary damages be awarded for injury done under color of law. 42 U.S.C. § 1983. Though the damages action has been dismissed as to the Sheriff, the claim for damages against defendants other than the Sheriff is still a live controversy. Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L. Ed.2d 972 (1956) and Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1968) recognize that even *if the injunctive and declaratory relief* sought is moot, the courts retain jurisdiction to decide upon the appropriateness of awarding damages.

■ Moreover, the operational changes effected by Talisman do not moot even the declaratory and injunctive relief requested. A discontinuance of wrongful conduct does not alone warrant denial of injunctive relief, for the appropriateness of granting an injunction against now-discontinued acts depends upon the bona fides of the expressed intent to comply, the effectiveness of the discontinuance, and, in some cases, the character of past violations, United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). Where "the underlying question persists and is agitated by the continuing activities and program" of the defendant, Carroll v. President & Commissioners of Princess Anne, 393 U.S. 175, 179, 89 S. Ct. 347, 350, 21 L.Ed.2d 325 (1968), a controversy is not moot.

■ Though Talisman has spent substantial sums on mechanical harvesting equipment and has relinquished its permit to import Jamaican laborers, the harvesting equipment is experimental and might have to be abandoned for manual labor if weather conditions become adverse. The permit can be renewed at any time, and there has been no change in the domestic labor situation which would lead the Labor Department to deny Talisman another permit this year. Though barren at the moment, the camp still stands and can be instantly resuscitated should the company require more labor.

### II.  ABSTENTION

■ The principle of comity announced in Younger v. Harris applies only to the portion of this suit in which Sheriff Heidtman is the defendant. It does not preclude relief in federal court against Talisman Sugar Corporation and its employees.

At the time this suit was filed, the plaintiffs had been arrested by a deputy of Sheriff Heidtman, but no criminal trespass charges had been filed. After the appellants had filed notice of appeal to this court, an information was sworn out accusing appellants of criminal trespass in violation of F.S. § 821.01, F.S.A.

A hearing was later held on this charge in state court. Since we have held that Younger v. Harris is applicable not only to pending state court prosecutions, but to threatened future state prosecutions, Becker v. Thompson, 459 F.2d 919 (5 Cir. 1972), we hold that abstention in this case was proper insofar as the relief sought in federal district court was against the Sheriff. The proper forum for the plaintiffs to use to challenge the application of the criminal trespass statute to themselves was the court which dismissed these charges.

The doctrine of abstention is irrelevant to the other defendants in this case. Talisman and its employees were not parties to the state court prosecution, and they did not purport to act as officials of the State of Florida when they denied access to the appellants. Talisman's denial of entry, while backed up by the deputy's arrest, occurred both as a matter of company policy and as a matter of specific application to appellants even before the deputy sheriff arrived at the gate of the plantation.

In short, the state court prosecution could have no bearing upon whether or not Talisman's guards continued to deny admission to the plaintiffs. As to the aspects of this case in which Talisman is the defendant, therefore, the relief sought is not "against any pending or future court proceedings *as such.*" Fuentes v. Shevin, 407 U.S. 67 at 71 n. 3, 92 S.Ct. 1983 at 1989, 32 L.Ed.2d 556 (1971) (emphasis added).

### III. STATUTORY RIGHT OF ACCESS

Plaintiffs argue they are accorded an implied right to communicate with Talisman's workers on company property by the Sugar Act and the Wagner-Peyser Act, analogizing this right to the right of access which has been implied to protect organizational rights under the National Labor Relations Act.[4] An evaluation of this claim requires scrutiny of both the right of access which has been implied under the NLRA and of the purposes of the Sugar Act and Wagner-Peyser Act.

As the Supreme Court noted in Central Hardware Co. v. National Labor Relations Board, 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1971), the Section 7 right to form, join, or assist labor organizations "includes both the right of union officials to discuss organization with employees, and the right of employees to discuss organization among themselves." 407 U.S. at 542, 92 S.Ct. at 2241. To insure that employees can learn the advantages and disadvantages of organization, the courts have implied a right of access for nonemployee union organizers during organizational campaigns to the extent necessary to facilitate the exercise of employees' Section 7 rights.

The principle that the employer affected by the NLRA cannot so effectively isolate his employees that they are prevented from having contact with organizational groups is simpler to state than it is to apply. *Compare* NLRB v. Lake Superior Lumber Corp., 167 F.2d 147 (6 Cir. 1948) *with* NLRB v. Tamiment, Inc., 451 F.2d 794 (3 Cir. 1971). Were the UFW involved in an organizational campaign seeking to reach the Jamaican migrants and were such agricultural workers covered by the NLRA, we would be persuaded to follow the *Lake Superior Lumber* decision; if access to a lumber camp once a week and the provision by the employer of a recreation hall for discussion of union organization was too severe a limitation on the Section 7 rights of employees, access to workers once every two weeks while dispersed in town would surely be insufficient to insure the workers' rights. However, since this is not a labor dispute governed by the NLRA, but a problem arising under the Sugar Act and the Wagner-Peyser Act, it is to these Acts that we must turn to see whether a stat-

4. The NLRA does not apply to agricultural workers such as those involved in this litigation. See 29 U.S.C. § 152(3).

utory right of access should be implied to the plaintiffs over Talisman's property.

The Sugar Act of 1948, 7 U.S.C. § 1100 et seq. provides for payments by the Secretary of Agriculture to producers of sugar. However, these payments are conditioned upon the employer meeting certain standards such as payment in full at reasonable rates of all sugar cane workers. 7 U.S.C. § 1131(c)(1). The congressional intent of this conditional payments scheme was that sugar cane workers receive minimum wages to be set by the Secretary. See Salazar v. Hardin, D.C., 314 F.Supp. 1257 (1970).

Contrary to plaintiffs' contention, there is no evidence that Congress was primarily interested in the wages of domestic as opposed to foreign workers in cane fields when it enacted the Sugar Act. Nor have adequately-paid domestic employees hired by the same employer paying foreign employees at substandard levels been afforded protection under the regulations issued by the Secretary. The wage requirements apply with equal force to both foreign and domestic workers,[5] the employer is required to keep records demonstrating that *"each worker* has been paid in full,"[6] and that "any person who believes that *he* has not been paid in accordance with this part may file a wage claim."[7]

■ The basic objective of the Wagner-Peyser Act was to establish an interstate system for the recruiting and transfer of labor. 29 U.S.C. § 49(b). As we said in Gomez v. Florida State Employment Service, 417 F.2d 569, at 571–572 (5 Cir. 1969), the act was also intended to protect employees who move around the country to meet the needs of employers who use federal resources to secure workers. To fulfill this Congressional intention, we held in *Gomez* that the statute impliedly created a private civil remedy exercisable by the migrants against employers and officials charged with protecting their interests. We noted that it would have been unthinkable that Congress, "obviously concerned with people, would have left the Secretary with only the sanction of cutting off funds to the state." 417 F.2d at 576.

■ The principal beneficiaries of both these Acts, therefore, are the Jamaican migrants living in Talisman's labor camp, not the UFW organizers seeking access to them. In order to rely upon these laws, the UFW would have had to show that access by them is required to effectuate the migrant workers' statutory rights. No such showing has been made.

We conclude that plaintiffs had no statutory right of access under the Sugar Act or the Wagner-Peyser Act. We must, therefore, face the broader constitutional question posed by this litigation.

## IV. FIRST AMENDMENT RIGHT OF ACCESS

The district court's dismissal of this action was in part premised upon the theory that, even if the company were subject to First Amendment strictures, the plaintiffs were not proper parties to represent the alleged right of the migrant workers to receive information. The court did not consider the propriety of the plaintiffs asserting a First Amendment right to bring information to the migrants and enter into discussions with them. While we agree that the standing of the plaintiffs to assert the rights of the Jamaicans is far from clear, see Lamont v. Postmaster General, 381 U.S. 301 at 307–308, 85 S.Ct. 1493, 14 L.Ed.2d 398 (concurring opinion), even if we ignore the divergence of interests discussed above we pretermit this question since in our view plaintiffs have standing on another ground.

■ Two cases reaching opposite conclusions on the merits are instructive on the question of the standing of a dis-

---

5. 7 C.F.R. § 863.29.

6. 7 C.F.R. § 863.31 (emphasis added).

7. 7 C.F.R. § 863.33 (emphasis added).

seminator of information to sue to protect his own First Amendment rights. In Martin v. Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943), a city ordinance prohibiting persons from distributing handbills, circulars, or other advertisements door-to-door was held unconstitutional. The plaintiffs, accorded standing to question the ordinance's conformity to the First Amendment, were disseminators of religious information who had been arrested for door-to-door soliciting. In Breard v. Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951), in which an ordinance barring door-to-door commercial solicitation was upheld, the plaintiff magazine sales representative was held to have standing to assert his own right to distribute his wares although he could not represent the rights of housewives to receive his products. Similarly, the plaintiffs here have standing to sue as members of the public who have sought to communicate with the workers living on the company's plantation.

Turning to the merits, we must decide (1) whether sufficient state action exists to subject Talisman to the restraints of the First Amendment and (2) if so, whether the company's restraints on the rights of the plaintiffs to talk with the migrants were a reasonable exercise of its Fifth and Fourteenth Amendment property rights.

We begin with the proposition that "the First and Fourteenth Amendments safeguard the rights of free speech and assembly by limitations on *state* action, not on action by the owner of private property used nondiscriminatorily for private purposes only." Lloyd Corp. v. Tanner, 407 U.S. 551, at 567, 92 S.Ct. 2219, at 2228, 33 L.Ed.2d 131 (1971). While a "special solicitude" has been shown for the guarantees of the First Amendment, the Supreme Court "has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned and used nondiscriminatorily for private purposes only." 407 U.S., at 568, 92 S.Ct. at 2228. However, nei-

ther is property insulated from the strictures of the First Amendment merely because it is owned by an individual or a company rather than a formally incorporated governmental unit. Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). Our inquiry, therefore, must be directed at whether or not Talisman Sugar Corporation occupies the shoes of the state for First Amendment purposes vis-a-vis these workers and the plaintiffs who seek access to them.

Mr. Justice Black in *Marsh* described Chickasaw, Alabama, a company town wholly owned by Gulf Shipping Corporation, as follows:

"Except for [ownership by a private corporation] it has all the characteristics of any other American town. The property consists of residential buildings, streets, a system of sewers, a sewage disposal plant and a 'business block' on which business places are situated. A deputy of the Mobile County Sheriff, paid by the company, serves as the town's policeman. Merchants and service establishments have rented the stores and business places on the business block and the United States uses one of the places as a post office from which six carriers deliver mail to the people of Chickasaw and the adjacent area. The town and the surrounding neighborhood, which can not be distinguished from the Gulf property by anyone not familiar with the property lines, are thickly settled, and according to all indications the residents use the business block as their regular shopping center. To do so, they now, as they have for many years, make use of a company-owned paved street and sidewalk located alongside the store fronts in order to enter and leave the stores and the post office. Intersecting company-owned roads at each end of the business block lead into a four-lane public highway which runs parallel to the business block at a distance of thirty feet. There is nothing to stop highway traffic from coming onto the business block and upon

arrival a traveler may make free use of the facilities available there. In short the town and its shopping district are accessible to and freely used by the public in general and there is nothing to distinguish them from any other town and shopping center except the fact that the title to the property belongs to a private corporation." 326 U.S. at 502–503, 66 S.Ct. at 277.

The Court proceeded to hold that Gulf Shipping could not prohibit the plaintiff, a Jehovah's Witness, from distributing literature on the streets of Chickasaw.

█ Like Chickasaw, the Talisman labor camp consisted of residential areas, streets, a store, eating facilities, a post office, and even a chapel. It was a self-contained community in which municipal services were afforded for a thousand migrants [8] during the cane-cutting season, from fire protection and postal services to sewage, garbage disposal, and electric services.

█ The labor camp here is more closely analogous to the traditional "company town" than were the shopping centers in Amalgamated Food Employees Union v. Logan Valley Plaza, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968) and Lloyd Corporation v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1971). While both these centers had numerous stores, parking and walking areas, and guards performing functions similar to those of city police, neither was located on a tract of land nearly as large as Talisman's plantation nor did either provide the municipal facilities which normally accompany residential areas, such as postal services and garbage collections. In short, Talisman's labor camp is more like a "company town" than either of the shopping centers which were subjected to First Amendment restraints on the theory

that "where private interests were substituting for and performing the customary functions of government, First Amendment freedoms could not be denied where exercised in the customary manner on the town's sidewalks and streets." 407 U.S., at 562, 92 S.Ct., at 2225.

█ The threshold question of state action having been satisfied, the final inquiry under the First Amendment becomes the reasonableness of the owner's restraints on the petitioners' free speech rights. It is our obligation to accommodate the Fifth and Fourteenth Amendment rights of this property owner with the First Amendment right of those desiring access to the labor camp located within the plantation. The balancing of these various Constitutional rights, as the Supreme Court suggests in *Lloyd Corporation,* centers upon (1) the availability of alternative avenues of communication and (2) the use to which the property is put by the owner.

█ As our analysis of the statutory issue indicates, there are no effective alternatives open to the plaintiffs for communicating with the Jamaicans other than through access to the living area of the labor camp. The biweekly trip into Belle Glade is insufficiently frequent and otherwise inadequate to afford a reasonable opportunity for discussions between the plaintiffs and the workers. Nor is it reasonable to require the plaintiffs to sue the company for violating the Sugar Act and the Wagner-Peyser Act in order to obtain court orders permitting depositions to be taken from particular migrants. While we hold that Talisman must grant the plaintiffs access to the migrants in the labor camp, we nevertheless observe that the owner-employer may establish reasonable rules for granting access to prevent unnecessary interference with its business activities. Cf. Central Hardware Co. v.

8. The fact that only male Jamaicans lived in the camp is irrelevant; nothing in the First Amendment can be construed as providing protection for families, but not for individuals living separately from their families.

NLRB, 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1971).

The use to which Talisman has put its property also indicates that denial of access is an unreasonable restraint on the plaintiffs' rights. While general access to the public, standing alone, may in certain cases require that the owner allow the exercise of free speech on those parts of his property which are dedicated to public use, see Flower v. United States, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1971), the mere fact that the owner has sequestered its employees from general social intercourse with mankind can afford it no immunity from the prohibitions of the First Amendment. After all, many state-operated enterprises such as municipally-owned beaches and other recreational facilities are open only to town residents, but are nonetheless subject to the First Amendment's ambit. While openness to the public may prohibit the owner from excluding "those members of the public wishing to exercise their First Amendment rights on the premises in a manner and for a purpose generally consonant with the use to which the property is actually put," Logan Valley Plaza, 391 U.S., at 319–320, 88 S.Ct., at 1608 cited with approval in *Lloyd Corporation*, 407 U.S., at 560, 92 S.Ct. 2219, mere enclosure of a "company town" does not make it less of a town. By using its property as a round-the-clock habitat for its employees, Talisman has forfeited the broad right which the owner of sawgrass and marshes alone would have to enforce strictly a "No Trespassers" policy. Having located the functional equivalent of a thousand-resident municipality in the midst of its property, the company must accommodate its property rights to the extent necessary to allow the free flow of ideas and information between the plaintiffs and the migrants.[9]

## V. CLASS ACTION

The district court ruled that the plaintiffs had failed to show that, under Rule 23, "the class was so numerous that joinder of all members is impractical, that there are common questions of law and fact common to the class, that the plaintiffs fairly and adequately represent the purported class, and that the prosecution of this action will avoid the possibility of the prosecution of separate actions by individual members of the class." However, this finding was premised upon the incorrect assumption that only through humanitarian concern for and representation of the interests of the migrant workers would the plaintiffs have a right of access. Having held that the plaintiffs as members of the public desiring to communicate with the migrants cannot be subjected to such restraints upon their First Amendment rights, we further find it altogether appropriate that the plaintiffs represent members of the public claiming a right to communicate with the workers.

As a practical matter, the class action aspect of this case is unimportant. Our order holding that the company cannot totally isolate its employees from such outsiders as the plaintiffs should operate equally to foreclose Talisman from so barring other visitors, be they labor organizers, church-affiliated personnel, or newspaper reporters. It is only to clarify our position that any member of the public is entitled to access insofar as is necessary to insure contact with the workers that we mention the class action issue at all.

The judgment of the trial court is reversed and the case is remanded to the trial court for further proceedings not inconsistent with the decision herein.

9. The migrant workers here have neither invited nor rejected the plaintiffs, though as occupants of dwellings they clearly have the right to repudiate solicitors. See Martin v. Struthers and Breard v. Alexandria, supra. All we hold today is that the owner of the property cannot exercise for the workers the decision to remain totally isolated from outside influences.

SIMPSON, Circuit Judge (dissenting):

I respectfully dissent.

Talisman has abandoned its migrant labor camp operation in favor of mechanical harvesting equipment for which it has spent more than a million dollars, and has not renewed its permit to import Jamaican laborers. These circumstances render extremely tenuous any supposition that the former labor camp operation will ever be renewed. Nonetheless, says the majority, the camp still stands and can be instantly resuscitated should the company require more labor. For this reason and because of asserted residual questions of damages the majority refuses to dismiss the appeal as moot. Perhaps this is correct, although the question is not without difficulty.

Assuming then that we should consider the appeal on the merits, I agree with the lower court's conclusion that the plaintiffs had no standing to maintain this suit, and further that upon the facts and the law they were not entitled to the relief sought, either pendente lite or permanently. I would affirm the lower court's dismissal of the complaint at the cost of and with prejudice to the plaintiffs. The unpublished order of the district court is reproduced as Appendix A to this opinion.

## APPENDIX A

United States District Court
Southern District of Florida

Judith Ann Petersen, Franklin P. Smith and David Hernandez,
Plaintiffs,

versus No. 72–198–Civ–CF

Defendants.

Talisman Sugar Corporation, etc., William D. Pawley, Miguel Cervera, Sergio De la Vega, and William Heidtman, Sheriff of Palm Beach County, Florida,
Defendants.

## ORDER

This cause came before the Court upon plaintiffs' motion for a preliminary injunction. Although the Court was of the opinion that this cause was dismissable upon defendants' motion to dismiss, out of an over-abundance of caution this matter was scheduled for a hearing upon plaintiffs' application for injunction, and upon stipulation of counsel, this cause was consolidated with the hearing of the injunction application and was fully tried on its merits as to all issues, except the claim for damages, at the time of the injunction hearing. Rule 65(a)(2), Fed.R.Civ.P.

This is an action brought by an attorney, employed by the United Farm Workers, AFL–CIO, a domestic farm labor union, and two ministers, one the associate director of the National Farm Worker's Ministry and the other a staff member of the Florida Christian Migrant Ministry, on behalf of themselves and a purported class they represent. It is claimed by the plaintiffs that their purpose is to improve the economic and social conditions of agricultural workers and that their purpose has been frustrated by the defendants who have denied them free ingress and egress to the defendant Talisman's labor camp to visit with, meet with, and interview certain Jamaican farm laborers.

The defendant Talisman Sugar Corporation is a Florida corporation engaged in the growing, processing, and sale of sugar cane. In its business Talisman employs agricultural workers, both domestic and foreign. Because there are no domestic farm workers available to fill certain of its available positions, specifically sugar cane cutting or harvesting, defendant Talisman employes foreign laborers pursuant to various federal statutes and regulations, including but not limited to the Wagner-Peyser Act, 29 U.S.C. § 49 et seq. Defendant Pawley is the President of the defendant corporation; defendants Cervera and De la Vega are employees of Talisman. William Heidtman, Sheriff of Palm Beach County, Florida, has been joined as a defendant because he and his staff are authorized to enforce the various Florida criminal statutes, including § 821.01, trespass after warning. At this

time, members of the United Farm Workers who operate heavy equipment and machinery at Talisman Sugar Corporation are striking Talisman. Picketing outside Talisman has been occurring for some time.

This action has been brought pursuant to a multitude of Federal Statutes and United States Constitutional provisions. The jurisdictional bases which the plaintiffs allege for this action are as follows:

1. The First Amendment of the United States Constitution, freedom of speech, religion, and assembly;

2. The Fifth and Fourteenth Amendments to the United States Constitution, due process clause;

3. The Thirteenth Amendment to the United States Constitution, abolition of slavery;

4. 42 U.S.C. § 1983, civil rights actions for deprivation of rights under color of law, and 28 U.S.C. § 1343, jurisdiction over civil rights actions;

5. 18 U.S.C. § 245, criminal statute dealing with threatened or forceful interference with the exercise of certain civil rights;

6. 28 U.S.C. § 1331, federal question jurisdiction;

7. 28 U.S.C. § 1337, original jurisdiction of any civil action arising under Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies;

8. 29 U.S.C. § 49 et seq., Wagner-Peyser Act, establishing United States Employment Service;

9. 20 C.F.R. §§ 602, 604, and 620, Regulations promulgated under the Wagner-Peyser Act; and

10. 7 C.F.R. 863, Regulations promulgated under the U.S. Sugar Act.

As stated, the plaintiffs claim that theirs is a charitable purpose—to aid the plight of agricultural workers, particularly, in this case, the imported, temporary Jamaican farm workers employed by Talisman, and that this purpose cannot be accomplished without the defendant Talisman permitting the plaintiff and others to freely come and go into the Talisman labor camp. It is claimed that various rights of the plaintiffs have been improperly denied by Talisman's barring the plaintiffs' entry upon Talisman land and by the Sheriff's enforcement of Florida Statute § 821.01, F.S.A., trespass with warning. It is further alleged that the Jamaican workers housed upon Talisman land are being enslaved and held in some sort of bondage or involuntary servitude by reason of Talisman's refusal to permit entry onto Talisman land of the plaintiffs who wish to meet with the Jamaican workers.

This matter is alleged to be an emergency matter. It is alleged by the plaintiffs that they seek immediate entry into the Talisman camp so that they might "investigate" certain charges that the defendant Talisman has been utilizing the Jamaican laborers in jobs other than those for which they were brought to this country. The plaintiffs allege that it has been reported to them that the Jamaican laborers are performing jobs which were being performed by the striking farm workers—operation of farm equipment and machinery. The striking workers are members of the United Farm Workers. The plaintiffs wish to accomplish this investigation before the end of the harvesting season, because at the end thereof the foreign workers are sent back to their country. The season will end within a matter of days.

As stated, the plaintiff Petersen is counsel for the United Farm Workers, and one of the plaintiff ministers testified that 50 to 60 per cent of his time was spent advocating and furthering the cause of this union. Furthermore, the plaintiffs testified that they have participated in the ongoing picketing at Talisman, either by carrying pickets or by giving moral support and other aid to the picketers.

During the trial of this cause, it rapidly became clear that the plaintiffs' purpose was and is not to help these foreign farm laborers. The investigation which the plaintiffs wish to conduct and the information they wish to obtain therefrom could not benefit the Jamaican workers. Assuming there have been violations of law in the assignment of jobs to the Jamaicans, and that has never been proven, such information could only detriment the Jamaicans. If it was found that Jamaicans were being used in unauthorized positions, the defendant Talisman would lose the right to employ these workers, and the workers would be immediately deported. All this would be of benefit to the United Farm Workers, which apparently wishes to man these Jamaican-held positions with their own union workers—at a higher wage, of course—or, alternatively, wishes to cause the defendant Talisman, against whom the union is already on strike, further economic hardship. But this would be of no benefit to the foreign agricultural workers. Furthermore, if the plaintiffs were truly concerned about the Jamaican farm workers' welfare, it should not be a cause for their concern that these workers may be performing tasks easier than cutting sugar cane with a machete in a burned over field filled with snakes and rats.

Obviously, this case is nothing more than a tactic utilized by the union in an ongoing and heated labor dispute. This is not a suit brought to accomplish anything more than a result favorable to the union in this dispute. There has been no evidence to the contrary.

On the basis of these facts, the first and foremost question is the standing of the plaintiffs to bring this action. This is not a suit brought by the farm workers themselves such as Gomez v. Florida State Employment Service, 417 F.2d 569 (5th Cir. 1969). Plaintiffs allege, as one of the bases for jurisdiction in this case, the Thirteenth Amendment to the United States Constitution, abolition of slavery. But the plaintiffs are not persons affected by any sort of bondage. They have apparently asserted this Amendment only on behalf of the Jamaican workers employed by Talisman. None of the workers themselves have complained of enslavement, and there has been no showing whatsoever that these workers are serving in bondage or under conditions of involuntary servitude.

Standing has traditionally been held to mean that a party may only rely on those constitutional rights in which he has a personal interest. Tileston v. Ullman, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943). Under traditional rules of standing, there must appear a "logical nexus between the [plaintiffs' status] and the claim sought to be adjudicated." Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968). The party seeking relief must have a personal stake in the outcome of the controversy and concrete adverseness must be shown. Troutman v. Shriver, 417 F.2d 171 (5th Cir. 1962).

In this instance, it is clear that the plaintiffs have no personal stake in the rights of these Jamaican workers and may not rely on the Jamaicans' alleged constitutional rights as a basis for this lawsuit. The plaintiffs have no standing to assert these rights.

As stated, the present objective of the plaintiffs is to gain access to these foreign workers to investigate whether these workers are performing non-authorized jobs contrary to the Wagner-Peyser Act, 29 U.S.C. § 49 et seq., and the regulations thereunder. The plaintiffs, however, are not employees of any State, Federal, or Jamaican administrative agency authorized to conduct such investigations. Testimony given at the trial of this cause indicated that there are numerous agencies which regulate the employment of foreign laborers and, according to plaintiffs' complaint, defendant Talisman's business is highly regulated. Apparently, charges of violations of the Wagner-Peyser Act were filed with the appropriate State and Federal agencies and an administrative hearing was held with regard to these charges,

but there has been no finding by any investigative body, nor at the administrative hearing of any such violations. Nor were any violations proved to this Court. Furthermore, there has been no showing that the plaintiffs have any right to conduct yet another investigation into this matter.

It is also claimed by the plaintiffs that Florida Statute § 821.01, F.S.A., is not enforceable against the plaintiffs to prevent their entry into labor camp grounds. It is alleged that this is so because in 1969 the statute was amended and the words "labor camp" were deleted therefrom. Armed with this newly amended statute, the plaintiffs entered Talisman's land, refused Talisman's request to leave, refused repeated requests by the Sheriff to leave, and finally submitted themselves to arrest for trespassing.

The plaintiffs now seek a declaration from this Court that labor camps are no longer private property for the purposes of enforcing the Florida trespass laws. This is a Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) situation. What the plaintiffs seek is an injunction of some sort of the state prosecution for trespass. The Court finds no reason why plaintiffs' claim—that § 821.01 does not apply to labor camps and entry thereon—could not be asserted in State Court as a defense to the trespass charges, however. Furthermore, were the Court to rule upon this question, as requested, the plaintiffs have made no showing that the legislature intended to alter the law of property with regard to labor camps nor that trespass is not still a crime where it concerns enclosed lands in the form of labor camps.

Plaintiffs have brought this action in their own behalf and on behalf of all those similarly situated. Plaintiffs, however, have failed to make any showing under Rule 23, Fed.R.Civ.P., that the class is so numerous that joinder of all members is impracticable, that there are questions of law and fact common to the class, that the plaintiffs fairly and adequately represent the purported class, and that the prosecution of this action will avoid the possibility of the prosecution of separate actions by individual members of the class.

It would be difficult if not impossible to find any other parties with the same interests as these plaintiffs—being neither members of the United Farm Workers nor Jamaican laborers nor persons who truly wish to aid, comfort, and benefit the Jamaican workers. Thus, this is clearly not a proper class action nor, as stated, have plaintiffs laid a proper predicate to make it one.

Plaintiffs allege that they were deprived of certain constitutionally guaranteed rights; however, there has been no evidence to prove such claims. This suit is nothing more nor less than a labor dispute. The plaintiffs, on behalf of the United Farm Workers, are seeking here to use the civil rights laws and the First, Fifth, and Fourteenth Amendments to foster the Union's cause. In deciding this case, the Court is not unmindful of Folgueras v. Hassel, 331 F. Supp. 615 (W.D.Mich.1971), Exhibit D to plaintiffs' motion for preliminary injunction. However, the facts of this case are entirely different from those presented in Folgueras. The plaintiffs in Folgueras were members of a federal program, the Economic Opportunity Act program established for the purpose of aiding farm workers. Justice and equity alone demands a different decision in this case.

In order to afford plaintiffs an opportunity to fully present their case and so that a complete record could be developed, the Court denied defendants' early motion for dismissal of the complaint and reserved ruling upon defendants' motion for involuntary dismissal under Rule 41(b), F.R.Civ.P., after plaintiffs had presented their evidence. Pursuant to stipulation of counsel, approved by the Court, the cause has been tried upon the merits, except for the issue of damages.

The Court having found and concluded that the plaintiffs have no standing to maintain this case; and that upon the facts and the law the plaintiffs are not entitled to the relief sought, either pendente lite or permanently. It is thereupon

Ordered, adjudged and decreed that the complaint herein be and the same is hereby dismissed at the cost of and with prejudice to plaintiffs.

Done and ordered at West Palm Beach, Florida, this 10th day of March, 1972.

/s/ CHARLES B. FULTON
Chief Judge

cc: Joseph C. Segor, Esq.
Judith Ann Petersen, Esq.
Mershon, Sawyer, Johnston, Dunwody & Cole
Charles Kelso, Esq.