Marvin JENKINS, Lovette Belcher, and Willie C. Brown, Plaintiffs,

v.

S & A CHAISSAN & SONS, INC., Valley Growers Co-Op, Inc., Ashton Hart, Secretary of Valley Growers Co-Op, Inc., and Aldo V. Chaissan, Silvio Chaissan, Leland Behnke, officers, owners, agents and stockholders of S & A Chaissan & Sons, Inc., Defendants.

John McDONALD, Angin McNatt, Clarence Calloway, and Donnie Jackson, Plaintiffs,

v.

Michael NARDONE, John J. Currie, Michael Nardone d/b/a Michael Nardone Cold Storage, John F. Currie, Jr., Mid-Hudson Growers Co-Operative, Inc. and Charles Andola, Defendants.

James LUELLEN, Willie J. Johnson, Walter Myles, Leroy Johnson, and Theodore Young, Plaintiffs,

v.

STANLEY ORCHARDS, INC., Valley Growers Co-Op, Inc., Ashton Hart, Secretary of Valley Growers Co-Op, Inc., Lester Cohn, President of Stanley Orchards, Inc., and Stanley Cohn, owners, agents, and stockholders of Stanley Orchards, Inc., Defendants.

Nos. 77 Civ. 816, 77 Civ. 817 and 77 Civ. 818. (HFW).

United States District Court, S. D. New York.

March 15, 1978.

Mid Hudson Legal Services, Inc., Poughkeepsie, N. Y., Migrant Legal Action Program, Inc., Washington, D. C., for plaintiffs; Gene Reibman, White Plains, N. Y., Charles Horwitz, John Ebbott, of counsel.

Hays, St. John, Abramson & Heilbron, New York City, Wilkinson, Cragun & Barker, Washington, D. C., for defendants; Joseph Kevin McKay, New York City, Pierre J. LaForce, John M. Facciola, S. Steven Karalekas, Washington, D. C., of counsel.

## OPINION

WERKER, District Judge.

### I

The migrant farmworker plaintiffs in these consolidated actions seek to vindicate certain statutory and common law rights which they allege were infringed by the defendants, apple growers and associations of apple growers in the Hudson Valley and certain of their officers and shareholders. Plaintiffs assert that they are entitled to declaratory and equitable relief as well as money damages for the defendants' denial of their rights under the Wagner-Peyser Act of 1933, 29 U.S.C. § 49 *et seq.* (hereinafter "the Wagner-Peyser Act") and its regulations and common law breach of contract. Plaintiffs further assert that they are entitled to an award of actual damages or a statutory minimum of $500 for each of defendants' violations of the Farm Labor Contractor Registration Act of 1963, as amended, 7 U.S.C. § 2041 *et seq.* (hereinafter "FLCRA"). The matter comes before the Court pursuant to defendants' motions to dismiss the first amended complaints (hereinafter "the complaints") for failure to state claims upon which relief can be granted and lack of subject matter jurisdiction. Rules 12(b)(1), (6), Federal Rules of Civil Procedure. To facilitate discussion of these motions the Court will focus its attention on the complaint in *Jenkins v. S & A Chais-*

*san & Sons, Inc.* (77 Civ. 816), which parallels the allegations made in the other two consolidated actions.[1]

## II. BACKGROUND

The complaint alleges that both defendant S & A Chaissan & Sons, Inc. (hereinafter "SAC"), which is said to be in the business of growing apples, and defendant Valley Growers Co-op, Inc. (hereinafter "Valley Growers"), which is said to be an association of apple growers, through their officers, agents and employees, "recruited, solicited, furnished and hired plaintiffs." It goes on to recite that Ashton Hart is the secretary of Valley Growers; that Leland Behnke is an officer of SAC and responsible for its day-to-day operations; that defendants Aldo and Silvio Chaissan are the officers, owners, agents and stockholders of SAC; and that the plaintiffs were hired by the defendants to work the 1975 apple harvest in Ulster County, New York after having been recruited from other states for this task through the United States Employment and Training Service system (hereinafter "the USTES system") of the Department of Labor (hereinafter "the Department").

Established pursuant to the Wagner-Peyser Act, the USTES system operates through a network of federally-funded state employment services and provides a mechanism by which employers located in sections of the country where there are too few workers of a given kind can obtain government assistance in obtaining qualified workers from other areas. This assistance is provided without cost to either the employer or the employee. 20 C.F.R. § 602.2(a) (1977). Generally, before a request for workers, commonly known as a "job" or "clearance" order, can be sent through the interstate facilities of the USTES system, the employer and the state agency within the employer's state must each attempt to secure sufficient workers locally.[2] In addition, for *agricultural* job orders to be placed into the USTES system, certain further requirements must be fulfilled, among them: that the housing facilities for the agricultural employees comport with specified minimum standards, 20 C.F.R. §§ 620.1, 653.108(d)(2) (1977); that the employer sign an assurance that the job order accurately describes all of the material terms and conditions of the job, *id.* § 653.108(c)(3); and that the wages and working conditions offered the workers equal those of similarly employed persons in the intended area of employment, *id.* § (c)(4). Once these prerequisites have been met, suitable workers can be sought from other localities through a series of concentric searches through the USTES system, beginning with the immediate region and later directed to areas of the country where the supply of workers of the desired type exceeds the demand. In order to police the operation of the system, the Wagner-Peyser Act provides for the withdrawal of federal funding from state agencies found not to be in compliance with the regulatory scheme, 29 U.S.C. § 49d(b), and the state agencies themselves are authorized to refuse job orders from employers who have violated the published procedures. 20 C.F.R. §§ 658.500–658.502 (1977).

Plaintiffs assert that defendants violated the Wagner-Peyser Act and its regulatory counterparts by failing to live up to the terms of their job orders. In particular, plaintiffs allege that defendants deducted excessive amounts from plaintiffs' wages; failed to provide employment for the "guaranteed minimum period;" failed to keep adequate payroll records; failed to provide required written earnings statements; and

---

1. Recognizing the many similarities among the complaints, defendants have submitted substantive motion papers only in the *Jenkins* action. The arguments contained therein have been incorporated by reference in *pro forma* memoranda in the other actions.

2. However such a search need not be undertaken if the state agency believes that there will in the future be a shortage of workers in the local area despite the presently available supply. 20 C.F.R. § 653.108(d)(3).

paid wages which were both inadequate and discriminatory.[3]

Plaintiffs also assert claims against defendants under FLCRA, which was enacted to control abuses of migrant farmworkers by farm labor contractors, more commonly termed "crew leaders" or "crew chiefs." Such persons "are the middlemen in making work arrangements between farmworkers and growers and in this capacity often recruit, transport, supervise, handle pay arrangements, and otherwise act as an intermediary between the migrant worker and the farmer." Senate Report on FLCRA, S.Rep.No.202, 88th Cong., 2d Sess. 1, *reprinted in* [1964] U.S.Code Cong. & Admin. News, pp. 3690, 3691 (hereinafter "Senate Report").

Under FLCRA, a farm labor contractor must register and disclose to each worker the terms and conditions of his employment. 7 U.S.C. §§ 2043, 2045. Moreover, before an employer can engage the services of a farm labor contractor he must first determine that the contractor selected has a valid certificate of registration. 7 U.S.C. § 2043(c). For failure to comply with FLCRA, farm labor contractors, and presumably others, can be sued by migrant farmworkers, who are entitled to recover damages in an amount "equal to the amount of actual damages, or $500 for each [FLCRA] violation." [4]

Plaintiffs have asserted six separate FLCRA claims against defendants. The first, second, third and fourth claims for relief are evidently brought against all of the defendants and allege that they did not properly post or disclose the terms and conditions of plaintiffs' employment and occupancy of housing facilities.[5] Also alleged are knowing misrepresentations by the defendants regarding the terms, conditions and existence of employment.[6] The fifth claim for relief alleges that Valley Growers and Ashton Hart violated FLCRA by failing to disclose the terms and conditions of employment to the plaintiffs at the time they were recruited and by failing to com-

---

**3.** The claim of discrimination arises out of defendants' alleged use of temporary agricultural workers from the West Indies to help harvest the crops. Plaintiffs maintain that these workers were given greater opportunity to pick apples and more productive sites. Since agricultural workers are compensated by the bushel, such practices would have enabled the foreign workers to earn higher amounts.

**4.** The statute, as amended, expressly authorizes a *separate* recovery for each violation of "any provision of [FLCRA] or any regulation prescribed [t]hereunder." 7 U.S.C. § 2050a(b). The civil penalty was added when FLCRA was amended because of a "failure of enforcement" under FLCRA as initially enacted. *See Guerrero v. Garza,* 418 F.Supp. 182, 189–90 (W.D.Wis. 1976).

**5.** With respect to these claims, 7 U.S.C. § 2045 provides that every farm labor contractor shall—

(b) ascertain and disclose to each worker at the time the worker is recruited the following information to the best of his knowledge and belief: (1) the area of employment, (2) the crops and operations on which he may be employed, (3) the transportation, housing, and insurance to be provided him, (4) the wage rates to be paid him, (5) the charges to be made by the contractor for his services, (6) the period of employment, (7) the existence of a strike or other concerted stoppage,

slowdown, or interruption of operations by employees at a place of contracted employment, and (8) the existence of any arrangements with any owner, proprietor, or agent of any commercial or retail establishment in the area of employment under which he is to receive a commission or any other benefit resulting from any sales provided to such commercial or retail establishment from the migrant workers whom he recruits. The disclosure required under this subsection shall be in writing in a language in which the worker is fluent, and written in a manner understandable by such workers on such forms and under such terms and conditions as the Secretary shall prescribe.

(c) upon arrival at a given place of employment, post in a conspicuous place a written statement of the terms and conditions of that employment;

(d) in the event he manages, supervises, or otherwise controls the housing facilities, post in a conspicuous place the terms and conditions of occupancy;

**6.** The Secretary, pursuant to 7 U.S.C. § 2044(b)(2), may impose sanctions upon any farm labor contractor found to have—

knowingly . . . given false or misleading information to migrant workers concerning the terms, conditions, or existence of agricultural employment.

ply with the terms of the working arrangements entered into with them.[7] The eighth claim for relief alleges, in the alternative, that if SAC, Aldo and Silvio Chaissan and Leland Behnke are not farm labor contractors, they nevertheless violated FLCRA by engaging the services of Valley Growers and Ashton Hart without first determining that they possessed valid registration certificates from the Secretary of Labor (hereinafter the "Secretary").[8]

Finally, plaintiffs have asserted in the seventh, allegedly pendent claim for relief that defendants breached the contract of employment with them by making excessive deductions from their pay; overcharging them for meals; providing substandard housing; failing to comply with FLCRA standards; and failing to provide: (1) the guaranteed minimum period of employment at the guaranteed hourly minimum wage, (2) transportation and subsistence expenses to and from the place of recruitment, and (3) the materials necessary for performance of plaintiffs' job duties.

Defendants argue that the Wagner-Peyser Act claim must be dismissed because no private cause of action for damages was expressly or impliedly created by that statute. Defendants further contend that the FLCRA claims must be dismissed since each of the defendants either falls outside the definition of a farm labor contractor or is expressly exempt from coverage under that enactment. Finally, defendants maintain that in the absence of a legally sufficient federal cause of action, the breach of contract claim must also be dismissed for want of either diversity or pendent jurisdiction.

The FLCRA and Wagner-Peyser Act contentions raise several interesting issues which are addressed in this memorandum. In view of the manner in which those claims are resolved, the jurisdictional argu-

ments raised by the defendants need not be considered.

### III. THE WAGNER–PEYSER ACT CLAIM

Although the Wagner-Peyser Act does not by its terms create a private cause of action to recover damages, both the Fifth Circuit in *Gomez v. Florida State Employment Service,* 417 F.2d 569 (5th Cir. 1969), and several district courts which have followed that decision, *see Cantu v. Owatonna Canning Co.,* No. 76–374, slip op. at 3–6 (D.Minn. Jan. 6, 1977); *Abraham v. Beatrice Foods Co.,* 418 F.Supp. 1384, 1388 (E.D.Wis.1976); *Vazquez v. Ferre,* 404 F.Supp. 815 (D.N.J.1975); *Galindo v. Del Monte Corp.,* 382 F.Supp. 464 (N.D.Ill.1974), have considered it appropriate to imply such a remedy after examining both the act and the regulations that accompany it. Defendants maintain that these cases are no longer dispositive in view of (1) the Secretary's recent promulgation of an administrative complaint procedure for the USTES system and (2) the decision of the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), which deals with the propriety of implied remedies. I disagree.

In *Gomez,* the Fifth Circuit observed as a preliminary matter that Congressional failure to provide an express private remedy was not determinative of whether a cause of action for damages could be stated, since implied remedies were frequently made available by the judiciary in order to further the apparent purpose of Congress. *Gomez v. Florida State Employment Service,* 417 F.2d at 575–76. The court went on to note that it was desirable to imply a right of action under the Wagner-Peyser Act in view of the unavailability of any other effective remedy for wrongs to migrant workers and the increasing trend toward

---

**7.** Pursuant to 7 U.S.C. § 2044(b)(4), the Secretary may also sanction any contractor who "has failed, without justification, to comply with the terms of any working arrangements he has made with migrant workers."

**8.** Pursuant to 7 U.S.C. § 2043(c), no person may—

engage the services of any farm labor contractor to supply farm laborers unless he first determines that the farm labor contractor possesses a certificate from the Secretary that is in full force and effect at the time he contracts with the farm labor contractor.

reliance upon private suits as the means by which the public gained enforcement of important congressional policies. *Id.* at 576. The opinion in *Cort v. Ash* makes clear, however, that an implied remedy cannot be made available, as it was in *Gomez*, merely because there is a need for such relief. *See University of Chicago v. McDaniel*, 423 U.S. 810, 96 S.Ct. 20, 46 L.Ed.2d 30 (1975), *rev'g mem.* 512 F.2d 583 (7th Cir.). Rather, in arriving at its determination a court must examine several factors, as follows:

> "First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,'—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?"

*Cort v. Ash*, 422 U.S. at 78, 95 S.Ct. at 2088 (citations omitted). It is my belief that, contrary to the defendants' assertions, each of the factors identified in *Cort* militates in favor of implying a private civil remedy for the migrant laborer plaintiffs in this action.

Turning first to the intended beneficiary of the Wagner-Peyser Act, although the legislative materials available to me indicate that the primary purpose of Congress was to provide for a national system of public employment agencies to be operated by the states without cost to either their employee or their employer clients, Report on the National Employment Service, H.R. Rep.No.158, S.Rep.No.63, 73d Cong., 1st Sess. (1933), express provision was made for a "farm placement service." 29 U.S.C. § 49b(a). Surely Congress must have intended that this service was to be operated (at least in part) for the benefit of the migrants, for if it were otherwise the USTES system might have become, in effect, an employment agency without employee clients and, hence, an entity incapable of providing manpower to areas encountering seasonal shortages of labor. *See* 41 Op.Atty.Gen. 406, 412 (1959). Indeed, defendants as much as concede the point in their papers by choosing to base their anti-implication argument upon the remaining factors considered in the *Cort* opinion.

 The second factor cited in *Cort* moves the focus of inquiry from zone of interest analysis to a more fundamental consideration of Congressional intent. However, a specific Congressional intention to create a private right of action need not be demonstrated as long as the statute in question was clearly enacted for the benefit of the persons whose interests the plaintiff seeks to vindicate, that is, as long as the first *Cort* factor has been established. *Cort v. Ash*, 422 U.S. at 82, 95 S.Ct. 2080; Note, Implying Private Causes of Action from Federal Statutes: *Amtrak* and *Cort* Apply the Brakes, 17 B.C.Ind. & Com.L.Rev. 53, 63 (1975). Every court that has explored this issue has concluded that the USTES system was, in fact, developed for the special benefit of migrant farmworkers such as plaintiffs, *e. g., Gomez v. Florida State Employment Service*, 417 F.2d at 576; *Cantu v. Owatonna Canning Co.,* slip op. at 5, and I frankly see no difficulty in this regard. The opinion in *Cort* does state that a different conclusion would be necessary in situations in which an explicit intent to *deny* a cause of action could be shown, *Cort v. Ash*, 422 U.S. at 82, 95 S.Ct. 2080, but neither the terms of the Wagner-Peyser Act nor any of the legislative history surrounding its enactment expressly precludes derivation of a private remedy for the migrant workers here. Defendants maintain that the statutory procedure for withdrawing federal funding from states that have not complied with the detailed plans required under the Wagner-Peyser Act should be taken as an indication that Congress meant to deny migrant workers access to a private right of action, but that penalty only addresses situations in which state agencies have not properly spent the federal funds made available to them; it does not even attempt

to provide a remedy to those wronged by employer abuses in states where the responsible state agency is altogether blameless.

The decisions in *Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975), and *National Railroad Passenger Corp. v. National Association of Railroad Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974) (hereinafter *"AMTRAK "*), which are cited by defendants, are as a consequence inapposite. In *Barbour,* the receiver of a failed broker-dealer sued on behalf of its customers to compel the Securities Investor Protection Corporation to wind up the affairs of the broker-dealer pursuant to authority that it had been granted under the Securities Investor Protection Act of 1970. However, after reviewing the statutory framework, the Supreme Court held that no private right of action could be implied under the Act because Congress, by creating a public agency to protect investors, had demonstrated that it was unwilling to entrust such responsibilities to a private attorney general whose personal interest and limited access to information might operate against the best interest of the public. *Securities Investor Protection Corp. v. Barbour,* 421 U.S. at 422–23, 95 S.Ct. 1733.[9] Similarly, *AMTRAK* involved a suit to enjoin discontinuance of passenger trains that had previously been operated by the Central of Georgia Railway. In that case, the Supreme Court declared that the jurisdiction-granting section of the Rail Passenger Service Act of 1970 was meant to create a public cause of action through which the United States Attorney General could bring suit to prevent acts in violation of the statute, but went on to hold that this necessarily precluded implication of a private cause of action for the same relief. *AMTRAK,* 414 U.S. 457, 458–65, 94 S.Ct. 690. By comparison, plaintiffs here are not attempting to usurp powers more logically wielded by public entities for, by bringing this lawsuit, they seek to redress a problem clearly different than that which might impel the Secretary of Labor to invoke the statutory procedure for cutting off a state employment service's federal funds. I therefore conclude that the sanction of loss of federal funds cannot be taken as any indication that Congress meant to foreclose other remedial avenues.

The third *Cort* factor requires consideration of whether a private remedy for damages would be "consistent with the underlying purposes of the legislative scheme." *Cort v. Ash,* 422 U.S. at 78, 95 S.Ct. at 2088. Defendants contend in this regard that private lawsuits by migrant workers would undermine the complaint procedure recently instituted by the Secretary at the behest of the federal judiciary. *See NAACP, Western Region v. Brennan,* 360 F.Supp. 1006 (D.D.C.1973). Plaintiffs, needless to say, see no such difficulty. In weighing the competing assertions of the parties, I will make reference to the Secretary's most recent formulation of the complaint procedure, now codified at 20 C.F.R. Part 658 (1977).[10]

The regulatory procedure established by the Secretary, insofar as pertinent to this action, is as follows: Each state employment service and regional office of the Department is required to establish and maintain a complaint system. 20 C.F.R. §§ 658.-410(a), 658.420(a). When a migrant worker lodges a written complaint at a local office of the state agency, alleging that an employer failed to comply with USTES system regulations, the complaint is referred to the local office manager or other local office employee designated as the responsible official. *Id.* § 658.411(b)(3). The local agency official is required to offer the complaining migrant worker appropriate assistance,

---

**9.** Significantly, the Act gave the Securities and Exchange Commission "plenary authority" over the Corporation, including the right to bring a federal court proceeding to compel the Corporation to discharge its statutory responsibilities. *AMTRAK,* 421 U.S. at 417–18, 95 S.Ct. 1733.

**10.** Guidelines for a complaint procedure were previously consolidated in General Administration Letter No. 10–75 of the Department's Manpower Administration.

"such as referral to another job," *id.* at § 658.413(a)(1), and must also investigate and attempt to resolve the complaint. *Id.* § 658.414(a). If some resolution is not arrived at within five days after filing, however, the complaint is referred to the state office, which then has 20 days to seek an informal resolution of the controversy. *Id.* § 658.414(b), (c). If that is again not possible, the migrant worker is told why and is notified that he is entitled to have a hearing upon written request within 30 days. *Id.* § 658.414(c). Assuming that such a request is made, a designated state hearing official schedules a hearing and allows the parties to present testimony and documentary evidence. *Id.* § 658.414(d). After the hearing, the official must prepare a written decision from which the migrant worker may, if he wishes, perfect an appeal to the regional office of the Department. *Id.* § 658.416(b), (c).

With respect to employers, if a designated local employment service officer, or higher official, finds reason to believe that there has been a violation of the USTES system he must informally attempt to resolve the problem. After 30 days, however, the matter must be referred to the state employment service director, who is obliged to undertake a formal investigation. *Id.* § 658.501. If the state director concludes that there has, in fact, been a violation he must notify the employer that termination of all services previously provided through the USTES system will be "initiated" in 30 days, "unless the employer provides conclusive, documented evidence within the 30 day period" showing that there has been no violation or that the violation has been corrected. *Id.* Services to an employer can then be terminated 15 days after the close of the 30 day waiting period, unless the employer has established that it was or is not in violation or has requested a hearing, in which event the matter is referred to a state hearing official for decision. *Id.* § 658.502.

Although the complaint procedures set forth in the final regulations are rather detailed, there is one glaring deficiency: no express provision has been made for the recovery of damages by a migrant farmworker injured by reason of his employer's violation of the Wagner-Peyser Act or the regulations promulgated thereunder. An agricultural employer is obligated to *correct* violations in order to receive the assistance of the USTES system, but this does not necessarily mean that the employer would also have to make compensatory payments to aggrieved workers. Indeed, even if the Secretary were to direct that an award of damages be made to a migrant worker, there would not be any way to compel compliance in situations in which the employer was willing to forego the services available through the USTES system, for example by resorting to private employment agencies. While defendants argue that this is a practical impossibility,[11] if the problem were merely theoretical it is unlikely that the Secretary would have noted as he did that the complaint procedures were drafted narrowly for fear that more stringent procedures would cause employers to "take their business elsewhere." 42 Fed. Reg. 4722 (1977).

■ Accordingly, since there is no guarantee that farmworkers could enforce monetary awards granted by the officials charged with hearing their complaints, I see nothing inconsistent in allowing them to bring independent Wagner-Peyser Act suits in district court.

■ With regard to the fourth *Cort* factor, many of the plaintiffs' grievances could concededly also be aired in a state court action for breach of contract, as the pen-

---

11. Defendants assert, in this regard, that they must either obtain workers through the USTES system or forego harvesting their crops. While it is true that employers who fail to comply with the regulations governing the USTES system may be unable to obtain the necessary visas for temporary foreign workers, *see* 8 U.S.C. §§ 1101(a)(15)(H)(ii), 1103; 20 C.F.R. § 602.10(b) (1977); *see also* 20 C.F.R. § 602.-10(e) (1977), the court is unable to find at this juncture that the use of such workers is actually required in order to get the apple crop to market.

dent claim in this lawsuit makes manifest.[12] Nevertheless, I agree with the *Gomez* court's view that "civil suits under local concepts" cannot afford migrant workers adequate protection, *Gomez v. Florida State Employment Service,* 417 F.2d at 576, and therefore conclude that even if plaintiffs' cause of action is in an area traditionally relegated to state law, maintenance of the instant action can hardly be considered "inappropriate." [13]

Defendant's motions to dismiss the plaintiffs' claims for relief under the Wagner-Peyser Act are therefore denied.

## IV. THE FLCRA CLAIMS

The plaintiffs advance two theories of recovery under FLCRA. Their principal contention is that each of the defendants had a statutory duty to register as a farm labor contractor and therefore to meet certain specified obligations to. plaintiffs. Plaintiffs contend, in the alternative, that if SAC, Aldo and Silvio Chaissan and Leland Behnke did not have any obligation to register as farm labor contractors, they nevertheless still violated FLCRA by retaining the services of Valley Growers and Ashton Hart without first determining that those defendants had valid farm labor contractor certificates.

In order to recover on their claims under FLCRA, plaintiffs must establish that they have dealt with farm labor contractors within the meaning of the statute. Section 3 of FLCRA, as amended, 7 U.S.C. § 2042(b), defines a farm labor contractor as a person who

for a fee, either for himself or on behalf of another person, recruits, solicits, hires, furnishes, or transports migrant workers . . . for agricultural employment.

Excluded from the statutory definition, however, are:

(2) any farmer . . . who personally engages in any such activity for the pur-

pose of supplying migrant workers solely for his own operation;

and

(3) any full-time or regular employee of any entity referred to in . . . (2) above who engages in such activity solely for his employer on no more than an incidental basis.

*Id.* § (b)(2), (3).

Apart from describing the defendants in several introductory paragraphs, plaintiffs have limited their showing that FLCRA applies here to three paragraphs of their complaint in which it is alleged that:

20. Plaintiffs were recruited and solicited by defendants in late summer or early fall of 1975 to work for them in the apple harvest in Ulster County, New York. The recruitment was accomplished through defendants' use of an agent of the Florida Employment Service. Said agent contacted plaintiffs and solicited them on the basis of defendants' clearance orders which the New York State Employment Service had forwarded to the Florida Employment Service as part of the interstate recruitment system described above.

21. Defendants offered and plaintiffs accepted employment pursuant to the terms of the clearance orders placed with the [USTES system] by defendants during 1975.

\* \* \* \* \* \*

24. Defendants, for a fee, recruited, solicited, hired, furnished and transported plaintiff migrant workers for agricultural labor during 1975. While engaging in said activities defendants were not registered as Farm Labor Contractors with the Secretary . . . ..

The question is whether these allegations, if accepted at face value, suffice to show that defendants abrogated a statutory duty to register with the Secretary as farm labor contractors and, hence, that plaintiffs have

---

**12.** The diversity jurisdiction of this court would, of course, most likely be unavailable for want of the requisite jurisdictional amount. 28 U.S.C. § 1332.

**13.** *See generally* Note, Migrant Farm Labor in Upstate New York, 4 Col.J.L. & Soc.Probs. 1, 4 (1968).

stated a cause of action for actual damages or the FLCRA statutory penalty.

In order to answer that question it is helpful to begin by briefly adverting to some of the problems that led to the enactment of FLCRA. Farming is, of course, a seasonal enterprise, requiring different numbers of able bodied persons at various times of the year. Thus in New York State, for example, it has been estimated that the harvest and pre-harvest activities of farms necessitate the hiring of approximately 31,000 additional agricultural workers during the summer and early fall of each year. Note, *supra,* 4 Col.J.L. & Soc. Probs. at 4–5. Because the supply of persons willing to toil in the fields is increasingly limited, moreover, some 17,000 of these laborers must annually be recruited from out of state. It is for reasons such as these that farm labor contractors play an important role. As the Senate Labor and Public Welfare Committee has put it:

> The relationship between migratory workers and their farm employers is often temporary and impersonal. The labor contractor organizes groups of workers in areas in which they live, establishes contact between them and the growers who are often located in labor shortage areas in other States, and helps to provide continuity of employment. He usually provides the means of transportation for members of his crew, lends them money if necessary during the season, pays them their wages, handles all contacts with the grower, and generally supervises the workers on the job. He is,

therefore, the individual who has the most continuing relationship with these migrant workers.

Senate Report at 2, [1964] U.S.Code Cong. & Admin.News, at p. 3691. Given the extreme dependence of migrant workers, it is scarcely surprising that crew leader abuses often arise. The list of such abuses is lengthy, but among the principal problems disclosed by a 1962 Department survey were exposure to unsafe conditions, improper payment of wages (or failure to pay any wages at all), and misrepresentations about the work which was offered. *Id.* at 2, [1964] U.S.Code Cong. & Admin.News, at p. 3692; *see* Senate Labor and Public Welfare Comm. Report on the FLCRA Amendments of 1974, Sen.Rep.No.1295, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 6441, 6442.

■ FLCRA was enacted in an effort to curtail such wrongful conduct. Although the legislation was intended to

> remove the impediments, obstructions, and restraints occasioned to the flow of interstate commerce by the activities of such irresponsible contractors by requiring that all persons engaged in the activity of contracting for the services of workers for agricultural employment comply with the provisions of this chapter and all regulations prescribed hereunder by the Secretary . . .,

FLCRA § 2, 7 U.S.C. § 2041(b) (as amended), both the number of statutory exemptions from coverage [14] and the Congression-

---

**14.** In addition to the exceptions noted earlier, the FLCRA definition of a farm labor contractor also excludes:

(1) any nonprofit charitable organization, public or nonprofit private educational institution, or similar organization;

\* \* \* \* \* \*

(4) any person who engages in any such activity (A) solely within a twenty-five mile intrastate radius of his permanent place of residence and (B) for not more than thirteen weeks per year;

(5) any person who engages in any such activity for the purpose of obtaining migrant workers of any foreign nation for employment in the United States if the employment is subject to—

(A) an agreement between the United States and such foreign nation; or

(B) an arrangement with the government of any foreign nation under which written contracts for the employment of such workers are provided for and the enforcement thereof is provided for through the United States by an instrumentality of such foreign nation;

(6) any full-time or regular employee of any person holding a certificate of registration under this chapter;

(7) any common carrier or any full-time regular employee thereof engaged solely in the transportation of migrant workers;

(8) any custom combine, hay harvesting, or sheep shearing operation, or

al debates [15] indicate that FLCRA was not meant to govern the activities of all those associated with the use of migrant labor. Rather, as was suggested in *Salinas v. Amalgamated Sugar Co.,* 341 F.Supp. 311 (D.Idaho 1972), only middlemen, or those traditionally thought of as crew leaders, were meant to fall within the ambit of the statute. It is quite clear that farmers such as SAC, who are themselves often the victims of abuses by farm labor contractors,[16] hardly meet that standard. And, indeed, any attempt to impose liability on them might lead to serious due process problems in view of the criminal penalties now provided under 7 U.S.C. § 2048 for willful violation of FLCRA. *See, e. g., Smith v. Goguen,* 415 U.S. 566, 572, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); *Bouie v. City of Columbia,* 378 U.S. 347, 353, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964) (unforeseeable enlargement of criminal statute operates like *ex post facto* law).

■ Even if it is assumed, *arguendo,* that farmers were meant to be covered by the statute, SAC would still be entitled to dismissal of the FLCRA claim against it since it did not engage in the activities of a crewleader for a fee. Under FLCRA § 3, 7 U.S.C. § 2042(c), "the term 'fee' includes any money or other valuable consideration paid or promised to be paid to a person for services as a farm labor contractor." The Secretary has further promulgated regulations which state that a fee includes any "valuable consideration as this term is used [in] the law of contracts, paid or promised to be paid, [regardless of the] method." 29 C.F.R. § 415 (1977). In this regard, plaintiffs contend that the farm received a fee

within the meaning of the statute and regulations because it benefitted through use of the USTES system without cost and argue that they are entitled to rest on that allegation of the complaint for present purposes. However, there is no basis for concluding that mere use of a fully-subsidized employment service amounts to the payment of valuable consideration. *See* 1 Restatement of Contracts § 75 (1932). And the bald statement that the farm received a fee need not be blindly accepted in view of the more specific allegations of paragraph 20 of the complaint which state that recruitment was accomplished through the USTES system. *See* 5 C. Wright & A. Miller, Federal Practice & Procedure § 1363, at 659 (1969).

As against SAC, consequently, the first four claims for relief are dismissed.

Aldo and Silvio Chaissan and Leland Behnke maintain that they, too, are exempt from coverage under FLCRA because they are employees of a farm that recruits or hires workers "solely for. use in its own operation." 7 U.S.C. § 2042(b)(3). Plaintiffs reject that contention and note that the exemption for farmers, and hence the exemption for employees of a farmer, was narrowed by a 1974 amendment to FLCRA which added the requirement that the farmer-employer be "personally" engaged in the activities designated in the definition of a farm labor contractor. It is plaintiffs' view that SAC, as a corporation, falls outside the exemption by definition since it is incapable of doing anything "personally." *See, e. g., Marshall v. Souza Bros. Packing Co.,* No. 77–2353 (C.D.Cal. Nov. 14, 1977).

---

(9) any custom poultry harvesting, breeding, debeaking, sexing, or health service operation, provided the employees of the operation are not regularly required to be away from their domicile other than during their normal working hours.

* * * * * *

7 U.S.C. § 2042(b).

**15.** *E. g.,* 110 Cong.Rec. 19894 (1964) (remarks of Rep. Powell).

**16.** According to the Senate Labor and Public Welfare Committee:

Evidence has also emerged of contractor exploitation of farmers. The contractor would agree to arrive with a crew on a designated date, and simply fail to show up because better opportunities presented themselves elsewhere. This would leave the farmer with no help to harvest his ripening crop. More common is the practice of leaving after the first picking when the second and third pickings become more difficult, and consequently less profitable.

S.Rep. 1295 at 2, [1974] U.S.Code Cong. & Admin.News, at p. 6442.

■ From the legislative materials, it is apparent that the exemption for farmers was amended by adding the word "personally" in order to exclude large farms from coverage while still allowing those which are run essentially as small businesses to gain an exemption. *See generally* Hearings on H.R. 14254 Before the Subcomm. on Agricultural Labor of the House Comm. on Education and Labor, 94th Cong., 2d Sess. 14, 17–18 (1976). *But see Marshall v. Silver Creek Packing Co.,* No. 76–25, slip op. at 2 (E.D.Cal. Aug. 23, 1977). Thus, as Xavier Vela, Administrator of the Wage and Hour Division of the Employment Standards Division of the Department, stated in a recent opinion letter (dated October 3, 1977), the term "personally" may apply to a corporation if it is

> under the effective control of an individual whose authority is equivalent to that of a sole proprietor, and if that individual acts in person with respect to the farm labor contracting activities for the corporation.

The plaintiffs have incorporated several allegations into the complaint in an apparent effort to demonstrate that the farm's operation is substantial enough to preclude it from acting personally under the Department's opinion letter,[17] but I need not reach that issue since I believe that the officers of SAC are entitled to dismissal of the first four claims for relief brought against them, in any event, on the ground that they acted, if at all, as agents of SAC rather than as middlemen in the recruitment process.

■ With respect to Valley Growers and Ashton Hart, it is contended that they were included as parties defendant only "because the cooperative filed a job order on behalf of its grower members." Defendants' Memorandum at 9–10 (footnote deleted). However, even if Valley Growers' activities had been that limited, there would still be no reason to dismiss the FLCRA claims

brought against it. By engaging in recruitment activities on behalf of its membership, Valley Growers clearly assumed the position of middleman in the process of hiring migrant workers, which is, as has been noted, precisely the role that was of concern to Congress. It also received a fee for its activities if it assessed charges for its services to grower members, as plaintiffs maintain. *Usery v. Ventura Farm Labor Association, Inc.,* No. 75–2997, slip op. at 2–3 (C.D.Cal. Aug. 26, 1976); *Usery v. Coastal Growers Association,* 418 F.Supp. 99, 101 (C.D.Cal.1976); *El Comite de Campesinos v. S P Growers,* No. 75–895, slip op. at 5 (C.D.Cal. May 9, 1976). Since it therefore appears to meet the statutory definition of a farm labor contractor, *see Usery v. Point Sal Growers and Packers,* No. 75–3952 (C.D. Cal. Jan. 26, 1977), nothing in the history of FLCRA or its amendments would necessitate excusing it from liability merely because there may have been other persons, more traditionally thought of as labor contractors, in the migrant labor chain of recruitment.

■ The complaint alleges in conclusory terms that Ashton Hart was responsible for the privations visited upon plaintiffs, but indicates neither that he signed the job order submitted by his employer, nor how he might have otherwise have come to run afoul of FLCRA. I therefore hold that Hart cannot be held liable under FLCRA unless plaintiffs are able to demonstrate in an amended complaint how Hart functioned as a farm labor contractor. In the absence of any such showing, moreover, neither SAC nor any of its employees can be held liable under plaintiffs' alternative FLCRA theory for failure to demand that Hart produce a proper certificate of registration before being retained as a farm labor contractor.

---

**17.** According to the complaint, SAC has three officers, one of whom handles day-to-day operations; its 1975 apple harvest was estimated at 225,000 bushels; it sought 90 farmworkers through the USTES system to harvest those apples; and its gross income from the sale of apples in 1975 was approximately $733,500. This last calculation is based upon the Department of Agriculture's figure for the average commercial price per pound of apples in 1975 (6.8 cents).

## CONCLUSION

Since each of the complaints is worded somewhat differently, the parties are directed to confer within 30 days to determine if they can agree upon a form of order in conformity with this opinion and covering all three actions. Should the parties fail to reach agreement, an order is to be settled on notice within 10 days after the close of the 30 day period.

SO ORDERED.